**Nos. 25-5803, 25-6143**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

L.B., *et al.*,

*Plaintiffs/Appellees/Cross-Appellants*,

v.

PREMERA BLUE CROSS,

*Defendant/Appellant/Cross-Appellee.*

On Appeal from the United States District Court for the
Western District of Washington, No. 2:23-cv-00953-TSZ
Hon. Thomas S. Zilly

## PREMERA BLUE CROSS'S PRINCIPAL BRIEF
## REDACTED

ADAM H. CHARNES
KILPATRICK TOWNSEND &
  STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
(214) 922-7106
acharnes@ktslaw.com

STEPHANIE BEDARD
KILPATRICK TOWNSEND &
  STOCKTON LLP
1100 Peachtree Street NE
Suite 2800
Atlanta, GA 30309
(404) 815-6039
sbedard@ktslaw.com

GWENDOLYN C. PAYTON
JOHN R. NEELEMAN
KILPATRICK TOWNSEND &
  STOCKTON LLP
1420 Fifth Ave., Suite 3700
Seattle, WA 98101
(206) 626-7714
gpayton@ktslaw.com
jneeleman@ktslaw.com

*Attorneys for Premera Blue Cross*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................i

TABLE OF AUTHORITIES..................................................................iv

INTRODUCTION....................................................................................1

JURISDICTIONAL STATEMENT ........................................................4

STATUTORY AND REGULATORY AUTHORITIES...........................4

ISSUES PRESENTED ...........................................................................5

STATEMENT OF THE CASE ................................................................6

A.     Premera's contracts with A.B. and J.M. ........................................6

B.     Premera's gender-affirming surgery medical policy. ......................8

C.     Premera's Medical Policy is consistent with sound science
       and the consensus of the international medical
       community. ...............................................................................12

D.     A.B. requested a double mastectomy at age fifteen. .....................17

E.     J.M. underwent a mastectomy when he turned eighteen. ............20

F.     Procedural Background................................................................24

SUMMARY OF THE ARGUMENT ......................................................28

STANDARD OF REVIEW....................................................................32

ARGUMENT .......................................................................................33

I.     Premera's age-based restriction in its Medical Policy does
       not constitute sex discrimination under Section 1557. .................33

i

A. Under *Skrmetti* and *Pritchard*, a medical policy that classifies on the basis of diagnosis does not constitute sex discrimination under Section 1557. ..............34

B. Under *Skrmetti* and *Pritchard*, Premera's Medical Policy does not constitute sex discrimination.......................38

C. The Eleventh and Fourth Circuits have reached the same conclusion in analogous cases. ...................................40

D. *Bostock* does not alter the analysis.......................................41

E. Premera's Medical Policy does not discriminate on the basis of transgender status..............................................44

F. The district court's reasoning is irreconcilable with *Skrmetti*, *Pritchard*, and the decisions of other circuits. ...............................................................................47

    1. The summary judgment order rested on reasoning that *Skrmetti* squarely rejected.................47

    2. The August 12, 2025 order erroneously concluded that *Skrmetti* is distinguishable.................50

II. Neither basis for this Court's remand in *Pritchard* affords relief to A.B. or J.M. here............................................................55

A. There is no evidence that A.B. and J.M. were denied coverage for hormones or other treatment that would be covered by other diagnoses...................................56

B. There is no evidence that Premera's actions were a pretext for invidious discrimination. ...................................56

    1. The undisputed evidence shows that Premera's Medical Policy is based on medical science, not discriminatory animus...............................................59

ii

2.      Plaintiffs' alleged evidence of pretext fails to create a genuine fact dispute. ...................................... 62

III.    Applying Section 1557 to Premera violates the Spending Clause because Premera was not on notice of potential liability. ...................................................................... 70

IV.     The district court erred in finding the plaintiffs were entitled to prospective declaratory relief. ...................................... 75

CONCLUSION ................................................................................... 78

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acosta v. City Nat'l Corp.*,
922 F.3d 880 (9th Cir. 2019)..............................................................33

*Anderson v. Crouch*,
169 F.4th 474 (4th Cir. 2026) ...............26, 30, 34, 40, 41, 46, 47, 49, 51

*Arkansas v. U.S. Dep't of Educ.*,
742 F. Supp. 3d 919 (E.D. Mo. 2024)..................................................74

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006)...........................................................................71

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ................................................................. *passim*

*C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Illinois*,
No. 3:20-cv-06145-RJB, 2022 WL 17788148 (W.D. Wash. Dec.
19, 2022), *vacated sub nom. Pritchard ex rel. C.P. v. Blue
Cross Blue Shield of Ill.*, 159 F.4th 646 (9th Cir. 2025).......................26

*Cardenas v. Anzai*,
311 F.3d 929 (9th Cir. 2002)..............................................................78

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) ..............................................................77

*Cornhusker Cas. Ins. Co. v. Kachman*,
553 F.3d 1187 (9th Cir. 2009).............................................................32

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022)...................................................... 70, 71, 72, 73

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
948 F.3d 673 (5th Cir. 2020), *aff'd*, 596 U.S. 212 (2022)...................70

iv

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999)................................................................71

*DeFries v. Union Pac. R.R. Co.*,
104 F.4th 1091 (9th Cir. 2024) .......................................62

*Folwell v. Kadel*,
145 S. Ct. 2838 (2025)......................................................49

*Garey v. James S. Farrin, P.C.*,
35 F.4th 917 (4th Cir. 2022) ...........................................78

*Geduldig v. Aiello*,
417 U.S. 484 (1974)..................................................37, 45

*General Electric Co. v. Gilbert*,
429 U.S. 125 (1976)...........................................................37

*Gest v. Bradbury*,
443 F.3d 1177 (9th Cir. 2006)....................................77, 78

*Jones v. L.A. Cent. Plaza LLC*,
74 F.4th 1053 (9th Cir. 2023) ...................................76, 77

*K.K. v. Premera Blue Cross*,
No. 23-35480, 2025 WL 415721 (9th Cir. Feb. 6, 2025).......................7

*Kadel v. Folwell*,
100 F.4th 122 (4th Cir. 2024), *vacated sub nom. Crouch v.
Anderson*, 145 S. Ct. 2835 (2025)................................ 26, 30, 40, 48, 49

*Kansas v. U.S. Dep't of Educ.*,
739 F. Supp. 3d 902 (D. Kan. 2024), *appeal dismissed per
stipulation*, No. 24-3097, 2025 WL 1914861 (10th Cir. Mar.
13, 2025)................................................................74

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*,
927 F.3d 396 (6th Cir. 2019)...........................................78

*Lange v. Houston Cnty.*,
152 F.4th 1245 (11th Cir. 2025) ............................. 30, 34, 40, 46, 51

v

*Lange v. Houston County,*
608 F. Supp. 3d 1340 (M.D. Ga. 2022), *rev'd,* 152 F.4th 1245
(11th Cir. 2025)................................................................26

*Leong v. Potter,*
347 F.3d 1117 (9th Cir. 2003).........................................66

*LL Liquor, Inc. v. Montana,*
835 F. App'x 917 (9th Cir. 2020).....................................57

*Mayfield v. United States,*
599 F.3d 964 (9th Cir. 2010).....................................33, 76

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012).............................................. 70, 71

*Oklahoma v. Cardona,*
743 F. Supp. 3d 1314 (W.D. Okla. 2024) ..........................74

*Opara v. Yellen,*
57 F.4th 709 (9th Cir. 2023) .....................................58, 64

*Phillips v. U.S. Customs & Border Prot.,*
74 F.4th 986 (9th Cir. 2023) ...........................................77

*Pritchard ex rel. C.P. v. Blue Cross Blue Shield of Illinois,*
159 F.4th 646 (9th Cir. 2025) .................................*passim*

*Reeves v. Sanderson Plumbing Prods., Inc.,*
530 U.S. 133 (2000)......................................................58

*Roe v. Critchfield,*
137 F.4th 912 (9th Cir. 2025) ................... 32, 72, 73, 74, 75

*RTC Transp., Inc. v. Conagra Poultry Co.,*
971 F.2d 368 (9th Cir. 1992)...........................................57

*Scanlon v. Cnty. of Los Angeles,*
92 F.4th 781 (9th Cir. 2024) ...........................................33

*Schmitt v. Kaiser Found. Health Plan of Wash.,*
965 F.3d 945 (9th Cir. 2020)......................................60, 61

*St. Mary's Honor Ctr. v. Hicks*,
　509 U.S. 502 (1993)..................................................................64

*Tennessee v. Cardona*,
　762 F. Supp. 3d 615 (E.D. Ky. 2025), *appeal dismissed per*
　*stipulation*, No. 25-5206 (6th Cir. May 13, 2026)..............................74

*Tex. Dep't of Cmty. Affs. v. Burdine*,
　450 U.S. 248 (1981)..................................................................58

*Town of Chester v. Laroe Ests., Inc.*,
　581 U.S. 433 (2017) .................................................................76

*United States v. Skrmetti*,
　605 U.S. 495 (2025)............................................................*passim*

*Villa v. Maricopa Cnty.*,
　865 F.3d 1224 (9th Cir. 2017)........................................................77

*Villiarimo v. Aloha Island Air, Inc.*,
　281 F.3d 1054 (9th Cir. 2002)........................................... 58, 64, 68, 69

*West Virginia v. B.P.J. ex rel. Jackson*,
　Nos. 24-43, 24-38, 2026 WL 1868739 (U.S. June 30,
　2026).......................................................................... 41, 44, 72

**Statutes**

28 U.S.C. §
　1291.................................................................................4
　1331.................................................................................4

Affordable Care Act,
　42 U.S.C. § 18116.................................................................. 4, 24

Education Amendments of 1972,
　20 U.S.C. § 1681(a) .............................................................. 4, 72, 73

RCW 48.43.537 .........................................................................20

Tenn. Code Ann. §
　68-33-101(b) .........................................................................52

68-33-101(c) ...................................................................52
68-33-101(m) .................................................................52
68-33-102(1) ..................................................................52
68-33-102(9) ..................................................................52
68-33-103(a)(1) ..............................................................52
68-33-103(b)(4) ..............................................................52
68-33-103(c)(2) ..............................................................52

**Regulations**

45 C.F.R. § 147.136 .......................................................20

WAC 284-43A-150 .........................................................20

**Rules**

Fed. R. App. P. 4(a)(1)(A) ...............................................4

**Other Authorities**

Am. Soc'y of Plastic Surgeons,
*ASPS Position Statement on Gender Surgery for Children
and Adolescents* (2026) ............................................ 16, 66

Am. Soc'y of Plastic Surgeons,
*ASPS statement to press regarding gender surgery for
adolescents* (2024) ........................................................15

Andrew Jacobs,
*Doctors' Group Endorses Restrictions on Gender-Related
Surgery for Minors*, N.Y. Times (Feb. 4, 2026) ................16

U.S. Dept. of Health & Human Servs.,
*Treatment for Pediatric Gender Dysphoria, Review of
Evidence and Best Practices* (2025) ...............................17

World Health Org.,
*Frequently Asked Questions (FAQ), WHO development of a
guideline on the health of trans and gender diverse people*
(Jan. 15, 2024).............................................................15

## INTRODUCTION

Premera Blue Cross's Medical Policy provides broad coverage for treatments for gender dysphoria—including hormones for both adults and minors and gender-affirming surgeries for adults who meet established clinical criteria. To be covered under any plan, services must be "medically necessary" as defined under the plan. For certain services, Premera applies more detailed medical policies, developed by qualified physicians, that are based on the current scientific literature. Those policies guide Premera's individualized assessment of whether the treatment a member seeks satisfies the plan's medical-necessity requirement.

For minors, the applicable Medical Policy generally restricts surgical coverage to adults because the overwhelming weight of medical evidence demonstrates no benefit to children and a substantial risk of harm. The Medical Policy is a guideline, not a mandatory rule, and each case is reviewed by a medical director. Premera approves surgery for minors in specific clinical situations when its medical directors determine the potential benefits to specific minors outweigh the risks— and it has done so for forty-four percent of minor claimants. Yet the

district court below held that this Medical Policy facially discriminates "on the basis of sex" in violation of Section 1557 of the Affordable Care Act. That conclusion cannot stand.

The Supreme Court resolved the issue in this case with unmistakable clarity in *United States v. Skrmetti*, 605 U.S. 495 (2025): a restriction on medical treatments based on a diagnosis of gender dysphoria "clearly does not classify on the basis of sex." *Id.* at 513. Because a medical treatment properly encompasses both the procedure and the diagnosis for which it is administered, the Court explained, restricting a medical procedure for a particular diagnosis while permitting that procedure for a different diagnosis is a classification based on diagnosis, not sex. Premera's policy operates in precisely the manner *Skrmetti* allows.

This Court applied *Skrmetti* in *Pritchard ex rel. C.P. v. Blue Cross Blue Shield of Illinois*, 159 F.4th 646 (9th Cir. 2025), holding that an exclusion of all gender-affirming care in another health insurer's plans did not violate Section 1557. The Eleventh and Fourth Circuits have since reached identical conclusions. The district court's contrary holding

2

in this case—which it reaffirmed after *Skrmetti*—is irreconcilable with this uniform authority.

Moreover, Plaintiffs A.B. and J.M. lack sufficient evidence to survive summary judgment on either basis on which this Court remanded in *Pritchard*: neither A.B. nor J.M. submitted evidence of denied coverage for treatments that would have been covered under a non-gender-dysphoria diagnosis, and no evidence supports a finding that Premera's medical justifications were pretextual. The Medical Policy is grounded in the scientific literature, consistent with peer insurers' and provider policies, and applied through individualized assessment—and the summary judgment record contains no evidence of invidious discriminatory intent.

Finally, even if some claim could otherwise survive summary judgment, Section 1557 cannot apply because Premera lacked the "clear notice" required under the Spending Clause that Section 1557's prohibition would reach a diagnosis-based medical policy. And in all events the district court erred in awarding declaratory relief to Plaintiffs, who have already undergone the surgery at issue and who

3

are over eighteen—so the policy no longer applies to them—and thus face no possibility of future injury.

This Court should reverse the sex-discrimination judgment below and remand with instructions to enter judgment for Premera.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs asserted claims under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116. 5-ER-1070-96. This Court has jurisdiction over the August 14, 2025 judgment, 1-ER-2-3, which resolved all claims asserted by all parties. 28 U.S.C. § 1291. Premera filed a timely notice of appeal on September 12, 2025. 5-ER-1124-26; Fed. R. App. P. 4(a)(1)(A). Plaintiffs cross-appealed on September 25, 2025. 5-ER-1122-23.

## STATUTORY AND REGULATORY AUTHORITIES

Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), appear in the Addendum.

## ISSUES PRESENTED

1.      Whether, in light of the Supreme Court's decision in *Skrmetti* and this Court's subsequent decision in *Pritchard*, Premera's denial of Plaintiffs' claims for gender-affirming surgery when they were minors constitutes discrimination on the basis of sex or transgender status.

2.      Whether A.B. and J.M. submitted sufficient evidence to survive summary judgment on any allegation that they had a qualifying diagnosis other than gender dysphoria, but the claim was denied nonetheless because of the gender dysphoria diagnosis.

3.      Whether A.B. and J.M. submitted sufficient evidence to survive summary judgment on any allegation that Premera's reasons for its denials of their claims were a pretext for invidious discrimination.

4.      Whether Premera lacked clear notice, as required under the Spending Clause, that Title IX's prohibition on sex discrimination would apply to a medical policy-based coverage determination denying gender-affirming surgery for members under eighteen diagnosed with gender dysphoria.

5.      Whether A.B. and J.M., who already underwent mastectomies and are over eighteen, have standing to assert a claim for declaratory relief.

## STATEMENT OF THE CASE

### A.      Premera's contracts with A.B. and J.M.

A.B. and J.M. receive health insurance coverage under plans issued by Premera. Those plans provide coverage only for services that are "medically necessary." The plans define "Medically Necessary" services as those a "physician, exercising prudent clinical judgment," would provide "to prevent, evaluate, diagnose, or treat an illness or injury or its symptoms." 2-ER-229; *see also* 2-ER-248. Medically Necessary services must be: (1) consistent with "generally accepted standards of medical practice," (2) "clinically appropriate, in terms of type, frequency, extent, site and duration," and (3) "considered effective for the patient's illness, injury or disease." 2-ER-248; *see also* 2-ER-229. "Generally accepted standards of medical practice" are "based on credible scientific evidence published in peer reviewed medical literature" and "recognized by the relevant medical community, physician specialty society recommendations and the views of

6

physicians practicing in relevant clinical areas and any other relevant factors." *Id.*

Premera uses more detailed criteria in medical policies that guide its determinations for specific medical issues.[1] Medical policies are developed based on "critical appraisal of the medical literature," professional society recommendations, and policies of other insurance plans and are approved by Premera's Medical Policy Committee. 2-ER-252-54; 2-ER-257-63; 2-ER-266. The medical policies are reviewed annually by a panel of doctors and are updated as needed to ensure they are consistent with current medical standards and follow national norms. 2-ER-265-66. Premera's medical directors have authority to deviate from medical policies to respond to specific clinical circumstances. 6-ER-1156-60. As one of Premera's medical directors explained, "no medical policy, no matter how well written it is, can cover all possible clinical situations." 2-ER-267.

---

[1] This Court has approved the use of such policies to implement health plans. *See K.K. v. Premera Blue Cross*, No. 23-35480, 2025 WL 415721, at *1 (9th Cir. Feb. 6, 2025).

A.B.'s and J.M.'s plans inform members that Premera uses medical policies that are "based on accepted clinical practice guidelines and industry standards" to "administer the terms of the plan," including to "further define medical necessity or investigative status for a specific procedure, drugs, biologic agents, devices, and level of care or services." 2-ER-222; 2-ER-233.

**B.    Premera's gender-affirming surgery medical policy.**

A.B.'s and J.M.'s plans specifically refer members to Premera's medical policy for gender-affirming surgery: "Benefits are provided for all gender affirming care surgical services which meet the criteria of the Premera medical policy…." 2-ER-226; *see also* 2-ER-237. Premera's Medical Policy "Gender Transition/Affirmation Surgery and Related Services" ("Medical Policy") covers gender-affirming surgeries when several criteria are met. 2-ER-271-326. These include a recommendation letter from a mental health professional confirming, among other things, a gender dysphoria diagnosis, the persistence of the dysphoria, that other possible mental health conditions have been assessed, and that the member is at least age eighteen. Premera covers

a broad range of non-surgical gender-affirming care, including hormones, for both adults and minors. 2-ER-82-107; 2-ER-285.

The Medical Policy was developed by Dr. Chelle Moat, Premera's Medical Director, and Dr. Robert Small, Premera's Assistant Medical Director for Behavioral Health. 2-ER-252. Dr. Moat worked as an internal medicine doctor and developed medical policies for nearly two decades, including eight years for Premera. 2-ER-333; 2-ER-336. Dr. Small is a board-certified Child and Adolescent Psychiatrist who has extensive training in critical appraisal of scientific studies and experience working with adolescents with gender dysphoria. 2-ER-251. Drs. Moat and Small evaluated the medical literature, professional society guidelines, and other insurers' policies to create the Medical Policy. 2-ER-254; 2-ER-258-63; 2-ER-266.

Premera's Medical Policy was "based primarily on critical appraisal of the medical literature," which showed no reliable evidence that gender-affirming surgery is generally appropriate for minors. 2-ER-258-63; 2-ER-266. As the Medical Policy itself explains, "[t]he most comprehensive and methodologically sound reviews of published studies have demonstrated that the evidence supporting gender

9

transition/affirmation surgery for adolescents is weak to non-existent." 2-ER-311. Among other things, minors lack the "substantial degree of developmental maturity … required in order to make a truly informed, educated decision to undergo such a transformation, and to understand all of the ramifications of such transformation including its irreversibility." 2-ER-309.

Premera also considered policies written by peer health carriers, the majority of which place age limits on gender surgeries. 2-ER-254-55. The Medical Policy was then reviewed and approved by the Medical Policy Committee comprised of medical professionals. 2-ER-339. This committee includes all physician medical directors at Premera, as well as nursing staff in leadership positions. 2-ER-253. Premera reviews the Medical Policy at least once a year to ensure it reflects the current state of medical science and has updated it numerous times to reflect changes in the medical literature. 2-ER-264-66.

In January 2023, Premera requested from Hayes, an independent scientific organization, an "evolving evidence review" of clinical evidence addressing gender-affirming surgical procedures for adolescents, to ensure that Premera had not missed any quality clinical studies in its

10

own review. The two Hayes evolving evidence reviews, which present unbiased analyses of published clinical evidence, *see* https://evidence.hayesinc.com/ea, and are available to all health plan administrators who are making evidence-based healthcare decisions, concluded that the strength and quality of the evidence for gender-affirming surgeries in adolescents is (1) "minimal" based on a review of full-text clinical studies, and (2) "[n]onexistent or unclear" based on a review of systematic reviews, clinical practice guidelines, and position statements. 3-ER-342-86.

Critically, although the Medical Policy generally limits gender-affirming surgery to members who are at least eighteen, Premera's medical directors conduct an individualized medical necessity review of *every* claim for gender-affirming surgery by a minor and approve coverage when clinical circumstances warrant a departure from the Medical Policy. Through this process, Premera has covered forty-four percent of requested gender surgeries for minors. 5-ER-1055-56. In no sense does Premera implement an across-the-board denial of claims for surgery for minors.

11

During this additional review, Premera's medical directors conduct a "relative risk analysis" on a "case-by-case basis." 2-ER-268. For example, Premera recognizes that some "adolescents … bind their breasts for gender affirmation" purposes, causing "potentially significant physical harms." *Id.* If Premera's review determines that "the potential physical harm from continuing to bind" for a patient is "greater than the potential harms from having the individual actually undergo a surgery," then Premera covers the surgery. *Id.* Likewise, if the member experiences "suicidal ideation or intent, or self-harm behaviors, or severe functional impairment," or if the member "has severe gynecomastia to the extent that binding is not feasible," Premera will determine whether the potential benefits of the surgery outweigh the potential harms for that individual. 4-ER-879-80.

## C. Premera's Medical Policy is consistent with sound science and the consensus of the international medical community.

Premera's conclusion that gender-affirming surgeries are generally not medically necessary under eighteen is consistent with the standard of care. 2-ER-258-63; 2-ER-271-326; 3-ER-342-637; 4-ER-639-776. The majority consensus in the medical community is that irreversible gender-affirming surgery should not be performed on

12

minors. *Id.* This view is based on: (1) the limited and low-quality evidence supporting the long-term benefits and safety of gender surgeries; (2) the irreversible long-term consequences; and (3) the inability of minors to provide fully informed consent. *Id.*

Most other insurers have similar restrictions on gender-affirming surgery for minors. 2-ER-330*;* 4-ER-790; 5-ER-1033-34. Additionally, most European national health systems, including those in the United Kingdom, Finland, Germany, and Sweden, do not provide gender-affirming surgeries for minors. 3-ER-387-637; 4-ER-639-776.

Premera's Medical Policy is also consistent with other healthcare organizations and providers. In fact, the healthcare provider at issue here, Seattle Children's Hospital, imposes an age limit of 16 for gender-affirming surgeries. 7-ER-1543-44. Plaintiffs' expert Dr. Schechter's practice at RUSH University Medical Center likewise imposes an age limit of 16 for mastectomies and 18 for genital surgeries. 2-ER-173-74.

To date, no high-quality, long-term studies demonstrate that clear benefits outweigh potential risks of surgeries for minors. 2-ER-258-63; 2-ER-271-326; 3-ER-342-637; 4-ER-639-776. Studies advocating for surgeries for minors have significant limitations, including insufficient

13

sample sizes, lack of control groups, short follow-up periods, and high dropout rates. *Id.* No valid comparison studies between those who pursue surgical transition as minors versus those who wait until adulthood exist. *Id.* No quality evidence shows long-term mental-health improvements. *Id.* There is no reliable data on rates of detransition and factors associated with regret, although the rate of detransitioning is increasing exponentially. *Id.*

In April 2024, the United Kingdom's National Health Service released the "Cass Review," the most comprehensive study on gender-affirming care to date. 3-ER-387-637; 4-ER-639-776. The Cass Review found very limited evidence to support the effectiveness of irreversible medical treatments for pediatric gender dysphoria. *Id.* It concluded that standard psychotherapeutic interventions should be the primary mode of treatment for minors seeking gender-affirming care. *Id.*

The World Health Organization likewise announced that it does not support surgical intervention on minors because, "on review, the evidence base for children and adolescents is limited and variable

14

regarding the longer-term outcomes of gender-affirming care for children and adolescents."[2]

The American Society of Plastic Surgeons ("ASPS"), which represents over 11,000 members and over ninety-two percent of the plastic surgeons in the U.S. and Canada, concluded in 2024 that because "there is considerable uncertainty as to the long-term efficacy for the use of chest and genital surgical interventions for the treatment of adolescents with gender dysphoria, and the existing evidence base is viewed as low quality/low certainty," ASPS "has not endorsed any organization's practice recommendations for the treatment of adolescents with gender dysphoria."[3]

In 2026, ASPS reaffirmed its position, concluding that "there is insufficient evidence demonstrating a favorable risk-benefit ratio for the

---

[2] World Health Org., *Frequently Asked Questions (FAQ), WHO development of a guideline on the health of trans and gender diverse people* 3 (Jan. 15, 2024), https://cdn.who.int/media/docs/default-source/hq-hiv-hepatitis-and-stis-library/tgd_faq_16012024.pdf.

[3] Am. Soc'y of Plastic Surgeons, *ASPS statement to press regarding gender surgery for adolescents* (2024), https://www.plasticsurgery.org/for-medical-professionals/publications/psn-extra/news/asps-statement-to-press-regarding-gender-surgery-for-adolescents.

15

pathway of gender-related endocrine and surgical interventions in children and adolescents" and recommending that "surgeons delay gender-related breast/chest, genital, and facial surgery until a patient is at least 19 years old."[4]

Though Plaintiffs relied on statements from the American Medical Association ("AMA"), which once opposed limitations on gender dysphoria treatment, the AMA now takes the position that gender-related "surgical interventions in minors should generally be deferred to adulthood."[5]

In 2025, the U.S. Department of Health and Human Services commissioned a comprehensive study of the scientific evidence and clinical practices surrounding the treatment of minors for gender dysphoria. The resulting peer-reviewed report concluded that "the

---

[4] Am. Soc'y of Plastic Surgeons, *ASPS Position Statement on Gender Surgery for Children and Adolescents* 3 (2026), https://www.plasticsurgery.org/documents/health-policy/positions/2026-gender-surgery-children-adolescents.pdf.

[5] Andrew Jacobs, *Doctors' Group Endorses Restrictions on Gender-Related Surgery for Minors*, N.Y. Times (Feb. 4, 2026), https://www.nytimes.com/2026/02/04/health/gender-surgery-minors-ama.html.

16

risk/benefit profile of medical and surgical interventions for children and adolescents with [gender dysphoria] is unfavorable."[6]

### D.    A.B. requested a double mastectomy at age fifteen.



---

[6] U.S. Dept. of Health & Human Servs., *Treatment for Pediatric Gender Dysphoria, Review of Evidence and Best Practices* 135 (2025), https://opa.hhs.gov/sites/default/files/2025-11/gender-dysphoria-report.pdf.

18





20

**E.     J.M. underwent a mastectomy when he turned eighteen.**

21



22



23



## F.    Procedural Background.

On June 27, 2023, Plaintiffs A.B. and his parents filed their class-action complaint, alleging sex and age discrimination in violation of Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116. 5-ER-1097-1121.

On June 4, 2024, Plaintiffs filed a Second Amended Complaint ("SAC") adding J.M. and his parents as Plaintiffs. 5-ER-1070-96. The SAC again alleged that Premera's Medical Policy violates Section 1557 by discriminating on the basis of sex and age. 5-ER-1090-94. Plaintiffs requested monetary, declaratory, and injunctive relief on behalf of a putative class. 5-ER-1095. Specifically, Plaintiffs sought (a) a declaration that Premera violated Section 1557 when it excluded "all coverage for gender-affirming chest surgery for transgender persons under the age of 18 in the Premera medical policy"; and (b) an order enjoining Premera from "designing, adopting, administering, or enforcing the medical policy that results in the exclusion of all coverage for gender-affirming chest surgery for transgender persons under the age of 18 and other similar

24

medical policies that Premera administers and enforces." *Id.* The SAC also asked the court to remand all rejected claims to Premera for reprocessing and, if the gender-affirming surgery were medically necessary, payment. *Id.*

After extensive discovery, both Plaintiffs and Premera moved for summary judgment. The district court granted summary judgment in part to Plaintiffs. 1-ER-13-44. The court found that Premera's Medical Policy violated Section 1557 by facially discriminating on the basis of sex. 1-ER-14; 1-ER-43. The court concluded that it "need not choose" whether the term "sex" should be limited to "a person's biological sex" or expanded to include "sexual orientation or transgender status," because "under either view, Premera's medical policy facially discriminates on the basis of sex." 1-ER-28. First, the court found that Premera's Medical Policy discriminated on the basis of biological sex because "breast reductions performed for gender-affirming reasons are potentially available to males under the age of eighteen, but not to females under the age of eighteen." 1-ER-30. Second, the court concluded that Premera's medical policy discriminates on the basis of "gender identity and/or transgender status" by "overtly differentiating between

25

transgender and cisgender youth or by using the proxy of gender dysphoria." 1-ER-32.

In so ruling, the district court relied extensively on *Bostock v. Clayton County*, 590 U.S. 644 (2020); the now-vacated district court opinion in *C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Illinois*, No. 3:20-cv-06145-RJB, 2022 WL 17788148 (W.D. Wash. Dec. 19, 2022), *vacated sub nom. Pritchard ex rel. C.P. v. Blue Cross Blue Shield of Ill.*, 159 F.4th 646 (9th Cir. 2025); the Fourth Circuit's now-vacated opinion in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024), *vacated sub nom. Crouch v. Anderson*, 145 S. Ct. 2835 (2025), which was subsequently rejected by the Fourth Circuit on remand, *Anderson v. Crouch*, 169 F.4th 474 (4th Cir. 2026); and the now-reversed district court opinion in *Lange v. Houston County*, 608 F. Supp. 3d 1340 (M.D. Ga. 2022), *rev'd*, 152 F.4th 1245 (11th Cir. 2025) (en banc). 1-ER-22; 1-ER-27-32.

Despite concluding that "A.B.'s and J.M.'s respective mastectomies (as well as J.M.'s reaching of adulthood) have left them with no basis to seek an injunction," the district court found A.B. and J.M. entitled to a declaratory judgment that Premera's Medical Policy "violates ACA § 1557 by facially discriminating on the basis of sex." 1-ER-39; 1-ER-43.

26

As to Plaintiffs' age discrimination claim, the district court granted summary judgment to Premera.[7] 1-ER-38.

The district court then asked the parties whether a trial remained necessary. 2-ER-71-72. Before the parties responded, however, the Supreme Court decided *Skrmetti*. The parties submitted supplemental briefing on the effect of *Skrmetti* on this case. 2-ER-46-70.

On August 12, 2025, the district court "concluded that *Skrmetti* does not alter the result in this case." 1-ER-4. The court first held that *Skrmetti* was distinguishable because Plaintiffs do not "present a constitutional tort claim or challenge any governmental action," and "this Court need not decide what level of scrutiny to apply." 1-ER-7. Next, the court distinguished *Skrmetti* because Premera's Medical Policy was not "governed by the ballot box" but rather was governed by Section 1557 and thus "involve[d] a fundamentally different type of claim." *Id.* The court then concluded that while the state law at issue in *Skrmetti* "applies to *all* minors regardless of sex," Premera's Medical Policy's mastectomy rule applies "solely to '*female* to male' or '*female* to non-

---

[7] The court also denied Plaintiffs' class certification motion. 1-ER-43. Plaintiffs did not appeal this ruling.

binary/gender neutral' minors" and offers "insurance coverage for one sex and not the other." 1-ER-8-9. The court invoked *Bostock*, concluding that its "but-for causation" analysis was "appropriately applied to ACA § 1557's 'on the basis of sex' standard" because "sex is the but-for cause of an insurance coverage denial under Premera's medical policies." 1-ER-10.

The district court then entered final judgment for Plaintiffs on their sex discrimination claim and for Premera on their age discrimination claim. 1-ER-2-3. The court awarded A.B. "$25,750 in out-of-pocket expenses and $1 in nominal damages" and J.M. "$1 in nominal damages." 1-ER-3. The court also declared that Premera's Medical Policy "violates Section 1557 … by facially discriminating on the basis of sex." 1-ER-2.

## SUMMARY OF THE ARGUMENT

The district court's holding that Premera facially discriminated "on the basis of sex" in violation of Section 1557 of the Affordable Care Act is irreconcilable with the Supreme Court's decision in *Skrmetti*, this Court's subsequent application of *Skrmetti* in *Pritchard*, and the

28

holdings of the Eleventh and Fourth Circuits. This Court should reverse the sex-discrimination judgment.

*First*, Premera's Medical Policy is not sex discrimination because it does not classify on the basis of sex. *Skrmetti* held that a restriction on medical treatments for minors based on a diagnosis of gender dysphoria "clearly does not classify on the basis of sex," but rather classifies on the basis of "medical treatment," which encompasses both the procedure and the diagnosis for which it is administered. Premera's medical policies operate in precisely the manner *Skrmetti* permits: they cover mastectomy for minors when the underlying diagnosis qualifies—gynecomastia, cancer, and other conditions—and restrict coverage when the diagnosis is gender dysphoria, regardless of the minor's sex.

This Court applied this very reasoning in *Pritchard*, which vacated summary judgment against a health insurer on materially indistinguishable facts. *Pritchard* held that by "excluding treatment for gender dysphoria, [the insurance company] removed that diagnosis from the range of conditions its insurance plans cover" and that, "[w]ithout more, sex is not a but-for cause of the exclusions' operation."

29

The Eleventh Circuit in *Lange* and the Fourth Circuit in *Anderson* have reached identical conclusions.

*Bostock v. Clayton County* does not alter the analysis. *Skrmetti* applied *Bostock*'s but-for causation framework and held that, when the patient's diagnosis is properly accounted for, sex is not a but-for cause of the coverage restriction.

For the same reasons, Premera did not discriminate on the basis of transgender status. *Skrmetti* held there is a "lack of identity" between transgender status and the excluded medical diagnoses, and that gender dysphoria cannot serve as a proxy for transgender status absent a showing that the policy's prohibitions are "mere pretexts designed to effect an invidious discrimination against transgender individuals." Premera has legitimate, nondiscriminatory reasons for its age-based limitation grounded in the scientific literature—the same type of justifications *Skrmetti* found legitimate.

The district court's reasoning—both in its initial summary judgment order and its post-*Skrmetti* supplemental order—rests on legal propositions that *Skrmetti* and *Pritchard* have squarely foreclosed. The court's reliance on the now-vacated *Kadel* decision is no longer

30

viable, and its attempt to distinguish *Skrmetti* as limited to the constitutional context was expressly rejected by this Court in *Pritchard*.

*Second*, even under the two avenues this Court left open for remand in *Pritchard*, A.B. and J.M. cannot survive summary judgment. Neither Plaintiff submitted evidence that he was entitled to mastectomies based on diagnoses other than gender dysphoria and was denied coverage for that treatment. Nor have Plaintiffs demonstrated that Premera's actions were pretextual. The undisputed record establishes that Premera's Medical Policy is grounded in the scientific literature, consistent with peer insurers' policies, and applied through individualized case-by-case assessment—including approval of forty-four percent of minor claimants' surgery requests. Plaintiffs' alleged pretext evidence—challenging the Policy's development timeline, comparing it to dissimilar gynecomastia coverage, questioning the exceptions, attacking the qualifications of Premera's Medical Directors, and comparing case-by-case criteria applied to transgender and non-transgender minors—does not create a genuine dispute of material fact.

*Third*, even if Plaintiffs' claims could otherwise survive, Section 1557 cannot be applied to Premera because the Spending Clause

31

requires that a funding recipient have "clear notice" of the conditions attached to federal funds. Title IX's text—applied by Section 1557—speaks only to "sex" and does not unambiguously prohibit discrimination based on gender identity or medical diagnosis. This Court in *Roe v. Critchfield*, 137 F.4th 912 (9th Cir. 2025), confirmed that a federal funding recipient lacks clear notice that Title IX's prohibition on sex discrimination extends to policies involving transgender status.

*Fourth*, the district court erred in awarding declaratory relief to Plaintiffs. Both A.B. and J.M. have already undergone the mastectomies at issue and are now over eighteen, so the challenged policy no longer applies to them. A plaintiff who has standing to seek damages for a past injury does not have standing for prospective relief unless he faces "certainly impending" future injury or a "substantial risk" of repeated harm. A.B. and J.M. face neither prospect here.

## STANDARD OF REVIEW

This Court reviews *de novo* decisions on cross-motions for summary judgment. *Cornhusker Cas. Ins. Co. v. Kachman*, 553 F.3d 1187, 1191 (9th Cir. 2009). This Court "must determine if, viewing the

evidence and drawing all inferences in the light most favorable to the non-moving party, any genuine issues of material fact remain and whether the district court correctly applied the relevant substantive law." *Scanlon v. Cnty. of Los Angeles*, 92 F.4th 781, 796-97 (9th Cir. 2024) (internal quotation marks omitted). "In reviewing cross-motions for summary judgment, 'each motion must be considered on its own merits.'" *Acosta v. City Nat'l Corp.*, 922 F.3d 880, 885 (9th Cir. 2019).

"[Q]uestions of standing are reviewed de novo." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010).

## ARGUMENT

### I. Premera's age-based restriction in its Medical Policy does not constitute sex discrimination under Section 1557.

The district court held that Premera's Medical Policy facially discriminates "on the basis of sex" in violation of Section 1557. The court's conclusion cannot be reconciled with the Supreme Court's decision in *Skrmetti*, which squarely held that a restriction on medical treatments for minors based on a diagnosis of gender dysphoria "clearly does not classify on the basis of sex." 605 U.S. at 513. Nor can it survive this Court's subsequent application of *Skrmetti* in *Pritchard*, which vacated summary judgment against a health insurer under Section

33

1557 on materially indistinguishable facts and held that "*Skrmetti*
rejected the district court's reasoning" in that case. 159 F.4th at 669.
The Eleventh and Fourth Circuits have reached the same conclusion.
*See Lange v. Houston Cnty.*, 152 F.4th 1245 (11th Cir. 2025) (en banc);
*Anderson v. Crouch*, 169 F.4th 474 (4th Cir. 2026). Together, these
authorities establish that Premera's Medical Policy does not
discriminate on the basis of sex or transgender status.

### A.    Under *Skrmetti* and *Pritchard*, a medical policy that classifies on the basis of diagnosis does not constitute sex discrimination under Section 1557.

The Supreme Court in *Skrmetti* confronted a Tennessee statute
(SB1) that prohibited healthcare providers from prescribing puberty
blockers or hormones to minors "for the purpose of" enabling a minor "to
identify with, or live as, a purported identity inconsistent with the
minor's sex" or treating "purported discomfort or distress from a
discordance between the minor's sex and asserted identity." 605 U.S. at
506. The plaintiffs argued that SB1 created "facial sex-based
classifications by defining the prohibited medical care based on the
patient's sex." *Id.* at 511. The Court disagreed. Writing for the Court,
Chief Justice Roberts explained that the state law "incorporates two

34

classifications": one based on age and another based on medical use. *Id.* Neither "classification[] turns on sex." *Id.* The statute "prohibits healthcare providers from administering puberty blockers and hormones to minors for certain medical uses, *regardless of a minor's sex.*" *Id.* (emphasis added). The Court rejected the premise that a statute's mere "reference to sex" is "sufficient to trigger heightened scrutiny," emphasizing that "[s]uch an approach … would be especially inappropriate in the medical context," where "[s]ome medical treatments and procedures are uniquely bound up in sex." *Id.* at 512.

The Court's reasoning rested on a critical insight about the nature of medical treatment. The plaintiffs had argued that a female adolescent could not receive testosterone to live as a male, while a male adolescent could receive testosterone for other purposes—thus creating a sex-based classification. *Id.* at 512-13. The Court rejected this framing as a distortion of "the meaning of the term 'medical treatment,'" because it omitted "a key aspect of any medical treatment: the underlying medical concern the treatment is intended to address." *Id.* at 513. Because a medical treatment is properly understood as encompassing both the drug *and* the diagnosis for which it is administered, "SB1

35

clearly does not classify on the basis of sex." *Id.* "[A] transgender boy …
tak[ing] puberty blockers to treat his gender incongruence … receives a
different medical treatment than a boy … who takes puberty blockers to
treat his precocious puberty." *Id.* at 513-14. SB1 "restricts which of
these medical treatments are available to minors" on the basis of the
diagnosis, not the child's sex. *Id.* at 514.

This Court applied *Skrmetti* in *Pritchard*. In *Pritchard*, this Court
confronted whether exclusions of gender-affirming care from employer-
sponsored health plans administered by Blue Cross Blue Shield of
Illinois ("BCBSIL") violated Section 1557. 159 F.4th at 653. The district
court had granted summary judgment to the plaintiffs, holding that
BCBSIL's "denial of benefits under the Plaintiffs' plans based on their
transgender status was discrimination on the basis of sex." *Id.* at 656.
This Court vacated that judgment, holding that the district court's
reasoning "fails in light of *Skrmetti*." *Id.* at 669.

*Pritchard* rejected three arguments the plaintiffs advanced to
distinguish *Skrmetti*. First, this Court held that *Skrmetti*'s reasoning
"reaches more broadly" than the constitutional context because
"*Skrmetti* applied the *Bostock* test, which arose in 'the Title VII context,'

36

not the constitutional context." *Id.* at 670. "*Skrmetti* assumed without deciding that the standards were identical," and therefore "*Skrmetti*'s gloss on *Bostock* applies to statutory cases like this one." *Id.*

Second, the Court rejected the argument that *Skrmetti* does not apply to Section 1557 claims because it relied on *Geduldig v. Aiello*, 417 U.S. 484 (1974). 159 F.4th at 670. When Congress enacted the Pregnancy Discrimination Act to override *Geduldig* and *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), it "defined 'because of sex' to incorporate 'pregnancy, childbirth, or related medical conditions,' but it changed nothing about gender dysphoria or gender reassignment." 159 F.4th at 670 (citations omitted). Thus, "Section 1557 bars discrimination against treatment for pregnancy and childbirth but not treatment for gender dysphoria." *Id.*

Third, the Court made clear that *Skrmetti*, rather than *Bostock*, applies here, holding that by "excluding treatment for gender dysphoria, BCBSIL removed that diagnosis from the range of conditions its insurance plans cover. Without more, sex is not a but-for cause of the exclusions' operation, and *Bostock* does not apply." *Id.* at 669-70.

37

### B. Under *Skrmetti* and *Pritchard*, Premera's Medical Policy does not constitute sex discrimination.

The Medical Policy provides that gender-affirming surgery is "considered medically necessary" only when certain criteria are met, including that the individual has a diagnosis of gender dysphoria and is "18 years of age or older." 1-ER-18-19. A separate medical policy provides that mastectomy for gynecomastia—"swelling of breast tissue in boys or men"—"may be considered medically necessary for non-malignant (not cancerous) indications for adults and adolescents" when enumerated criteria are satisfied. 1-ER-19. In short, Premera covers mastectomies for minors when the underlying diagnosis qualifies—gynecomastia, cancer, or other physical conditions—and restricts coverage for minors seeking the same procedure when the diagnosis is gender dysphoria. And this is true whether the minor is male or female.

This is precisely the structure the Supreme Court upheld in *Skrmetti*: a healthcare provider "may administer puberty blockers or hormones to any minor to treat a congenital defect, precocious puberty, disease, or physical injury," but "may not administer puberty blockers or hormones to any minor to treat gender dysphoria, gender identity disorder, or gender incongruence." 605 U.S. at 514. The Court held that

38

"[t]he application of that prohibition does not turn on sex." *Id.* Premera's policy operates identically—it denies coverage for surgery "to minors for certain medical uses, regardless of a minor's sex." *Id.* at 511.

The plan exclusions in *Pritchard* are similar. The plans in that case excluded all benefits—no matter the patient's age—for "gender reassignment surgery," including related drugs and therapy. 159 F.4th at 655. This Court held that *Skrmetti* controls. *Id.* at 669-70. "[B]y excluding treatment for gender dysphoria," this Court explained, "BCBSIL removed that diagnosis from the range of conditions its insurance plans cover. Without more, sex is not a but-for cause of the exclusions' operation." *Id.* That same principle applies fully here.

Finally, Premera's Medical Policy differs from SB1 in *Skrmetti* and the plan exclusions in *Pritchard* in an important way that further refutes any finding of discrimination: Premera has no categorical exclusion for gender-affirming care, uses its discretion for all claims for gender-affirming surgery, and *covers* gender-affirming surgery for those who are at least 18 in accordance with evidence-based guidelines.

### C. The Eleventh and Fourth Circuits have reached the same conclusion in analogous cases.

The circuit courts that have addressed the question since *Skrmetti* have uniformly reached the same result, further confirming that Premera's Medical Policy does not discriminate on the basis of sex.

In *Lange v. Houston County*, the Eleventh Circuit, sitting *en banc*, considered whether a county health insurance plan that excluded coverage for "sex change" operations violated Title VII. Applying *Skrmetti*, the court held that the "County's policy does not pay for a sex change operation for anyone regardless of their biological sex." 152 F.4th at 1252. The plan would cover "the procedures that make up a sex change for other purposes, such as treatment for cancer or reconstructive surgery following a car accident, whether or not the employee who needed those procedures was transgender." *Id.* at 1253. The Eleventh Circuit concluded that "[u]nder the logic of *Bostock*, … sex is simply not a but-for cause." *Id.* at 1252 (quoting *Skrmetti*, 605 U.S. at 522).

In *Anderson v. Crouch*, the Fourth Circuit—the same court whose prior decision in *Kadel* the district court here relied on so heavily— reversed course after its decision was vacated by the Supreme Court.

40

*Anderson* held that West Virginia's Medicaid exclusion of surgical treatments for gender dysphoria did not violate either the Equal Protection Clause or Section 1557. 169 F.4th at 480. The court explained that the exclusion "classifies based on medical diagnosis and applies evenhandedly to everyone." *Id.* at 486. Applying the *Bostock* test as interpreted in *Skrmetti*, the Fourth Circuit concluded that "'changing [a Plaintiff's] sex or transgender status does not alter' West Virginia's choice to decline coverage for the requested services." *Id.* at 493 (quoting *Skrmetti*, 605 U.S. at 520). The court further rejected the argument that gender dysphoria serves as a proxy for transgender status, holding that a "classification a law uses must also be inexplicable on grounds other than an intent to discriminate against a suspect class." *Id.* at 490. Because West Virginia put forth "legitimate, nondiscriminatory reasons for denying coverage," including cost and efficacy concerns, the exclusion could not be said to discriminate by proxy. *Id.* at 490-91.

### D. *Bostock* does not alter the analysis.

The district court relied extensively on *Bostock*. 1-ER-27-28; 1-ER-32. *Skrmetti* and *West Virginia v. B.P.J. ex rel. Jackson*, Nos. 24-43, 24-

41

38, 2026 WL 1868739 (U.S. June 30, 2026), foreclose its reliance on *Bostock* in the Section 1557 context.

The Supreme Court in *Skrmetti* applied *Bostock*'s but-for causation framework and concluded that "neither [the patient's] sex nor his transgender status is the but-for cause of his inability to obtain" the restricted treatment. 605 U.S. at 521. The Court demonstrated this through an example: if a transgender boy sought testosterone to treat gender dysphoria, the statute would prohibit it. *Id.* at 520-21. If his biological sex were changed from female to male, the statute "would still not permit him the hormones he seeks because he would lack a qualifying diagnosis for the testosterone." *Id.* at 520. The boy could receive testosterone "only if he had one of those permissible diagnoses," and "if he had such a diagnosis, he could obtain the testosterone regardless of his sex or transgender status." *Id.* at 521. The same analysis applies to Premera's Medical Policy: changing a minor patient's sex does not alter the policy's application because the age-based coverage limitation turns on diagnosis, not sex.

*Skrmetti* also rejected the argument that sex might be "one but-for cause" among several, explaining that there is "a key distinction

42

between the operation of SB1 and the logic of *Bostock*." *Id.* at 521. In *Bostock*, when a homosexual male employee's sex was changed, "he becomes a straight female whose attraction to men the employer tolerates"—his trait automatically transformed in a way that changed the employer's treatment. *Id.* By contrast, under SB1, "there is no reason why a female minor's diagnosis of hirsutism automatically changes to gender dysphoria when her sex is changed from female to male." *Id.* at 522. The same reasoning applies here: a minor female patient's diagnosis of gender dysphoria does not automatically change to a qualifying diagnosis when the patient's sex is changed to male.

In other words, *Bostock* asks whether changing sex while holding all other relevant facts constant changes the result. In the employment context, that is straightforward: a person assigned male at birth who identifies as female is treated differently from a person assigned female at birth who identifies as female. But the medical-policy context is different: because the diagnosis of gender dysphoria remains the same, a person assigned male at birth who identifies as female is treated exactly the same as a person assigned female at birth who identifies as female. Here, the relevant coverage question is not the patient's sex, but

43

whether a minor seeks surgery for a gender dysphoria diagnosis. Changing the patient's sex does not transform that diagnosis into a covered diagnosis.

In *B.P.J.*, the Supreme Court recently reinforced the inapplicability of *Bostock* outside the employment context. There, the Court held that "Title VII and *Bostock* are not relevant in this very different statutory and factual context" of Title IX-covered activities. *B.P.J.*, 2026 WL 1868739, at *9. The Court explained that "[i]n the workplace, Title VII generally requires that men and women be treated without regard to their sex," but "Title IX authorizes" sex-based distinctions—making the two statutes "vastly different." *Id.* Similarly, *Skrmetti* noted that "[s]ome medical treatments and procedures are uniquely bound up in sex"—including, for example, the FDA's approval of "drugs for use by only one sex." 605 U.S. at 512.

### E. Premera's Medical Policy does not discriminate on the basis of transgender status.

The district court separately held that Premera's Medical Policy "discriminates on the basis of sex by overtly differentiating between transgender and cisgender youth or by using the proxy of gender

dysphoria." 1-ER-32. *Skrmetti*, *Pritchard*, and this Court's sister circuits have uniformly rejected this reasoning.

In *Skrmetti*, the Supreme Court held that SB1 "does not exclude any individual from medical treatments on the basis of transgender status" but rather "removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." 605 U.S. at 518-19. The Court drew an analogy to *Geduldig*, which held that excluding pregnancy-related disabilities from an insurance plan was not sex discrimination because pregnancy and sex are not identical categories: not all women are pregnant, and the nonpregnant class includes both women and men. *Id.* at 518.

The Court applied the same reasoning in *Skrmetti*. Although treatment for gender dysphoria may be sought by transgender individuals, transgender status is not identical to the excluded medical diagnoses or procedures. *Id.* at 518-19. Not all transgender individuals have gender dysphoria, not all seek surgery, not all are minors, and not all seek the excluded procedures. Thus, as in *Geduldig*, the Court found a "lack of identity" between the protected status and the medical classification. *Id.* at 519.

45

In the same vein, the plaintiffs in *Pritchard* argued that a health insurer discriminated by focusing not on a "particular medical condition" but rather on "whether the care leads to 'gender reassignment,' which, of course, equates with transgender status." 159 F.4th at 671. This Court disagreed, finding that *Skrmetti* was indistinguishable on this basis because "the statute in *Skrmetti* also targets care leading to gender reassignment." *Id.*

In *Lange*, the Eleventh Circuit similarly reasoned that the health plan at issue turned on "medical use" and did not discriminate based on transgender status because the plan covered the underlying procedures that constitute gender-affirming surgery for other uses or diagnoses, such as "treatment for cancer or reconstructive surgery following a car accident, whether or not the employee who needed those procedures was transgender." 152 F.4th at 1253.

The Fourth Circuit in *Anderson* concluded that West Virginia's Medicaid exclusion did not use gender dysphoria as a proxy for transgender status. *Anderson* emphasized that "the classification a law uses must also be inexplicable on grounds other than an intent to discriminate against a suspect class." 169 F.4th at 490. Where there are

46

other grounds for the classification, "[t]he fact that a law targets something closely or exclusively associated with a protected class cannot alone support a presumption of discriminatory intent." *Id.*

Premera has legitimate, nondiscriminatory reasons for its age-based limitation: concerns about a minor's insufficient maturity to understand the irreversible consequences of gender-affirming surgery and the lack of robust long-term studies supporting such procedures for adolescents. *See supra* pp. 9-17. These are the same types of justifications that the Supreme Court found legitimate in *Skrmetti*, 605 U.S. at 522-25.

> **F. The district court's reasoning is irreconcilable with *Skrmetti*, *Pritchard*, and the decisions of other circuits.**
>
> > **1. The summary judgment order rested on reasoning that *Skrmetti* squarely rejected.**

The district court's April 18, 2025 order granted partial summary judgment to Plaintiffs, holding that Premera's Medical Policy violated Section 1557 by "facially discriminating on the basis of sex." 1-ER-43. The Order advanced three principal bases for that conclusion, each of which is foreclosed by *Skrmetti* and *Pritchard*.

47

*First*, the court reasoned that, under the "explicit terms" of Premera's Medical Policy, "breast reductions performed for gender-affirming reasons are potentially available to males under the age of eighteen, but not to females under the age of eighteen." 1-ER-30. It characterized this as "textbook sex discrimination." 1-ER-31. As demonstrated above, *see supra* pp. 34-37, this framing "contort[s] the meaning of the term 'medical treatment'" by omitting the diagnosis for which the procedure is performed. *Skrmetti*, 605 U.S. at 513. Mastectomy to treat gynecomastia and mastectomy to treat gender dysphoria are *different* medical treatments; restricting one use for minors while permitting the other is a classification based on medical diagnosis, not sex. *Id.* at 512-14.

*Second*, the court's analysis relied extensively and primarily on the Fourth Circuit's decision in *Kadel*. The court quoted *Kadel* at length for the proposition that healthcare plans covering treatments for certain diagnoses but barring coverage for diagnoses "unique to transgender patients" discriminate "on the basis of sex." 1-ER-28-29. The district court adopted *Kadel*'s reasoning wholesale. 1-ER-28-31.

48

*Kadel* is no longer good law. The Supreme Court vacated the Fourth Circuit's judgment and remanded for reconsideration in light of *Skrmetti. Folwell v. Kadel*, 145 S. Ct. 2838 (2025). On remand, the Fourth Circuit reversed course entirely in *Anderson*, holding that the exclusion of surgical treatments for gender dysphoria did not violate the Equal Protection Clause or Section 1557. *See supra* pp. 40-41. This Court in *Pritchard* likewise confirmed that *Kadel* is "no longer good law." 159 F.4th at 670. The district court's order, which rested principally on *Kadel*, therefore stands on no authority.

*Third*, the court concluded that "gender dysphoria is a proxy for transgender status" and that Premera's policy "discriminates on the basis of sex by overtly differentiating between transgender and cisgender youth." 1-ER-32. For the reasons explained above, *see supra* pp. 44-47, *Skrmetti* and its progeny foreclose this holding. The Supreme Court held that "there is a 'lack of identity' between transgender status and the excluded medical diagnoses," and required a showing "that [the statute's] prohibitions are mere pretexts designed to effect an invidious discrimination against transgender individuals" before any proxy claim

49

could succeed. *Skrmetti*, 605 U.S. at 519. No such showing has been made here, as explained below. *See infra* pp. 56-69.

### 2. The August 12, 2025 order erroneously concluded that *Skrmetti* is distinguishable.

After the Supreme Court decided *Skrmetti*, the district court issued a supplemental order on August 12, 2025, concluding that "*Skrmetti* does not alter the result in this case" and reaffirming its prior decision. 1-ER-4. The court offered three grounds for distinguishing *Skrmetti*, none of which withstands scrutiny.

*First*, the court emphasized that *Skrmetti* "involve[d] a fundamentally different type of claim than the ACA § 1557 claim raised in this case" and that, "[u]nlike the *Skrmetti* Court, this Court need not decide what level of scrutiny to apply." 1-ER-7. The court further observed that "Premera's medical policies are not governed by the ballot box" and that "'democratic processes' play no role" in this litigation. *Id.*

These distinctions are unavailing. This Court in *Pritchard* squarely addressed and rejected this argument, holding that "[t]hough *Skrmetti* was a constitutional case, its logic reaches more broadly." 159 F.4th at 670. This Court held that "*Skrmetti*'s gloss on *Bostock* applies to statutory cases like this one." *Id.* The Fourth Circuit reached the

50

same conclusion in *Anderson*, holding that because "*Skrmetti*'s approach to *Bostock* controls," the Medicaid exclusion at issue did not violate Section 1557. 169 F.4th at 494. The Eleventh Circuit's *en banc* decision in *Lange* likewise applied *Skrmetti*'s reasoning to a Title VII claim. 152 F.4th at 1251-52.

*Second*, the district court concluded that, whereas "SB1 applies to *all* minors regardless of sex," Premera's Medical Policy "applies solely to '*female* to male' or '*female* to non-binary/gender neutral' minors." 1-ER-8 (emphasis in the original). On this basis, the court asserted that "Premera's medical policies explicitly discriminate on the basis of 'sex.'" *Id.*

To begin with, the district court's conclusion that the Medical Policy applies only to gender-affirming surgery for minors born female is just plain wrong. The court erred because it focused only on the specific procedures sought by A.B. and J.M.: mastectomies. But the Medical Policy applies to *all* gender-affirming surgery: "surgery [that] changes sexual characteristics—the genitals and breasts, and in some cases other body areas such as the face or trunk." 2-ER-271. The Medical Policy therefore includes, for example, penectomy (the surgical

51

removal of the penis). 2-ER-275. Indeed, the very same provision applicable to A.B.'s and J.M.'s requests for mastectomy coverage also applies to requests for "breast augmentation" by "Male to female patients." *Id.* So, contrary to the district court's assertion, the Medical Policy does "appl[y] to *all* minors regardless of sex." *Id.*

Moreover, the district court's reasoning conflicts with *Skrmetti.* The Supreme Court in *Skrmetti* expressly held that a statute's "mere reference to sex" is insufficient to establish sex-based discrimination, noting that "[s]uch an approach … would be especially inappropriate in the medical context." 605 U.S. at 512. The SB1 statute at issue in *Skrmetti* itself contained numerous references to sex. *See, e.g.*, Tenn. Code Ann. §§ 68-33-101(b), (c), (m); *id.* § 68-33-102(1), (9); *id.* § 68-33-103(a)(1), (b)(4), (c)(2). Yet the Court found no sex-based classification because the operative distinction turned on diagnosis, not sex. The same is true here. Premera's Medical Policy uses sex-referencing terminology to describe the patient population for whom mastectomy is a recognized treatment for gender dysphoria, but the coverage limitation itself turns on the patient's age and diagnosis, not on sex. The policy references sex because mastectomies are inherently "bound

52

up in sex." *Skrmetti*, 605 U.S. at 512. As this Court emphasized in *Pritchard*, though the "exclusions reference sex, and though that reference may be relevant, it is not sufficient to trigger *Bostock*'s application." 159 F.4th at 670.

Moreover, the district court's August 12 order flouts *Skrmetti*'s core holding. The court reasoned that "sex is the but-for cause of an insurance coverage denial under Premera's medical policies—change the juvenile's sex and she becomes an adolescent boy whose request for a gender-affirming mastectomy is not subject to any age restriction." 1-ER-10. This formulation repeats the very error *Skrmetti* corrected. As explained above, *see supra* pp. 41-44, the Supreme Court demonstrated that properly applying *Bostock*'s but-for test to a medical-use restriction requires accounting for the patient's diagnosis—and when one does so, "sex is simply not a but-for cause." *Skrmetti*, 605 U.S. at 522. The district court changed the patient's sex while also altering the diagnosis from gender dysphoria to gynecomastia—precisely the methodology the Supreme Court rejected. As this Court held in *Pritchard*, "[w]ithout more, sex is not a but-for cause of the exclusions' operation, and *Bostock* does not apply." 159 F.4th at 670.

53

*Finally*, the district court's focus on Premera's unwritten exceptions is unavailing. The court observed that Premera had granted thirty-five percent (the actual figure is forty-four percent) of requests for gender-affirming chest surgery for minors through "unwritten or secret exceptions," and reasoned that this "vacillating conduct" undermined any assertion that the written policy has a "rational basis." 1-ER-10-11. This observation does not alter the discrimination analysis. To begin with, the court never explained how Premera's decision to *cover* surgery in specific situations for a large percentage of minors could possibly evidence sex discrimination. Indeed, the court's logic is completely backwards: Premera acted in a medically responsible manner by *providing* coverage to some members based on unique clinical circumstances. Premera's decision to provide coverage based on the member's clinical circumstances is not evidence of sex discrimination against other members who lacked those clinical circumstances. The different coverage decisions turned on the presence or absence of those clinical circumstances, not the patient's sex. Indeed, with respect to mastectomies, all of the patients—those who received coverage and those who did not—were biologically female and are transgender.

54

Moreover, the question before this Court is whether Premera's Medical Policy classifies on the basis of sex within the meaning of Section 1557—not whether the Medical Policy reflects optimal medical judgment. *See Skrmetti*, 605 U.S. at 525 (explaining that the Court's "role is not 'to judge the wisdom, fairness, or logic' of the law before us"). Even if the existence of case-by-case exceptions were somehow relevant to the merits of the underlying coverage decisions, it would not transform a diagnosis-based classification into a sex-based one. ███

███████████████████████████████████

███████████████████████████████████

██████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████ Premera's willingness to make individual exceptions reflects the exercise of careful clinical judgment, not evidence of sex discrimination.

## II. Neither basis for this Court's remand in *Pritchard* affords relief to A.B. or J.M. here.

Because Plaintiffs' facial sex discrimination claims cannot survive under *Skrmetti* and *Pritchard*, Plaintiffs' only option is to prove their

claims survived summary judgment on the two issues on which *Pritchard* remanded that case for further proceedings: that Plaintiffs (1) "had diagnoses (other than gender dysphoria) that entitled them to hormones or other treatment—but [Premera] still would not" cover the treatments; or (2) Premera's actions were somehow a pretext for invidious discrimination. 159 F.4th at 671-72. Neither basis for avoiding *Pritchard* survives summary judgment.

### A. There is no evidence that A.B. and J.M. were denied coverage for hormones or other treatment that would be covered by other diagnoses.

The first argument can be quickly disposed of: while both A.B. and J.M. had additional physical and mental health diagnoses, neither Plaintiff alleged nor submitted evidence that they were entitled to mastectomies based on diagnoses other than gender dysphoria and were nevertheless denied coverage for that treatment. They have therefore forfeited any such argument.

### B. There is no evidence that Premera's actions were a pretext for invidious discrimination.

The second avenue articulated by this Court in *Pritchard* is equally unavailing: none of Premera's actions amounted to "mere pretexts designed to effect an invidious discrimination against

56

transgender individuals." *Pritchard*, 159 F.4th at 671 (quoting *Skrmetti*, 605 U.S. at 519).

Initially, the question of pretext can and should be decided by this Court. Both parties addressed pretext in their briefing at summary judgment, so the issue was ripe for decision by the district court. 4-ER-811-12; 5-ER-1066-68. Though the court did not reach the question of pretext because it found that Premera's Medical Policy facially discriminated on the basis of sex, summary judgment is a legal question this Court would review de novo. For this reason, unlike in *Pritchard*, it is unnecessary for the Court to remand for the district court to address pretext. *See LL Liquor, Inc. v. Montana*, 835 F. App'x 917, 919 n.2 (9th Cir. 2020) ("If the district court avoids an issue that, on appellate review, becomes dispositive, we will decide a question of law and resolve the case.") (quoting *RTC Transp., Inc. v. Conagra Poultry Co.*, 971 F.2d 368, 375 (9th Cir. 1992)).

Because Premera has articulated legitimate, nondiscriminatory reasons for imposing an age limitation on gender-affirming surgery, Plaintiffs must show that Premera's well-documented reasons are pretextual "either directly by persuading the court that a

57

discriminatory reason more likely motivated [Premera] or indirectly by showing that [Premera's] proffered explanation is unworthy of credence." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002) (citation omitted).

Though Plaintiffs may rely on circumstantial evidence to show pretext, such evidence must be both "specific and substantial." *Id.* "[W]here abundant and uncontroverted independent evidence suggests that no discrimination … occurred, plaintiff's creat[ion of] only a weak issue of fact as to whether [defendant's] reason was untrue will not suffice" to survive summary judgment. *Opara v. Yellen*, 57 F.4th 709, 724 (9th Cir. 2023) (quotation marks omitted). Against a backdrop of "abundant and uncontroverted independent evidence that no discrimination ha[s] occurred," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000), Plaintiffs have not carried their "ultimate burden of persua[sion]" on this issue, *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). In short, in opposition to Premera's summary judgment motion, Plaintiffs submitted no evidence sufficient to create a fact question on pretext.

58

### 1. The undisputed evidence shows that Premera's Medical Policy is based on medical science, not discriminatory animus.

Premera's Medical Policy is grounded in science and is frequently reviewed and updated to reflect medical developments. Premera's highly qualified Medical Director and Assistant Medical Director evaluated the medical literature, professional society guidelines, and other insurers' policies to create the Medical Policy, and it is reviewed annually for revisions based on changes in the science as well as in the applicable laws and regulations. *See supra* pp. 7-11. The Medical Policy is reviewed and approved by its Medical Policy Committee, comprised of all physician medical directors at Premera, as well as nursing staff in leadership positions. 2-ER-253. And Premera requested two Hayes Reviews to confirm that it had not missed any evidence supporting pediatric gender surgeries. 3-ER-342-86. Premera's Medical Policy is also consistent with Seattle Children's policy, which imposes age limits for gender surgeries. 7-ER-1543-44.

Using the Medical Policy as a tool, Premera's medical directors analyze all gender-affirming surgery claims for minors on a case-by-case basis. 2-ER-268. Premera did not apply the Policy mechanistically:

59

it reviewed whether the submitted record showed significant physical harm from binding, suicidal ideation or intent, or severe gynecomastia making binding infeasible. 4-ER-879-80. Having undertaken this individualized assessment, Premera concluded these circumstances were not present in A.B.'s record. *Id.*

The question before this Court is whether the "fit" of any alleged proxy or pretext is "'sufficiently close' to make a discriminatory inference plausible." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 959 (9th Cir. 2020). In *Schmitt*, the health plan at issue excluded hearing aids, and members diagnosed with hearing loss brought a Section 1557 claim, alleging the exclusion amounted to proxy disability discrimination. *Id.* at 949, 958. As is the case here, the plaintiffs in *Schmitt* alleged "no facts giving rise to an inference of intentional discrimination besides the exclusion itself." *Id.* at 959. And as in this case, the alleged proxy was underinclusive: not all hearing disabled people want hearing aids, and some members instead sought other covered treatments, including cochlear implants. *Id.* This Court affirmed the dismissal of the Section 1557 claim, finding that this under-inclusiveness "undermine[d] a claim of proxy discrimination" and

60

that the plaintiffs had failed to show the "fit of their alleged proxy." *Id.* at 959-60.

So too here. Premera's individualized and comprehensive approach refutes any suggestion of discriminatory animus. Premera covers a broad range of gender-affirming care for both adults and minors. For adults, Premera covers medically necessary gender-affirming surgeries, hormones, and other treatments. 2-ER-82-107; 2-ER-271-326. And for minors it covers all medically necessary gender care other than surgery. 2-ER-82-107. And not all individuals with gender dysphoria seek surgery. Despite extensive discovery, Plaintiffs at summary judgment offered not a shred of evidence that discriminatory animus motivated the Medical Policy.

Finally, the record in this case lacks the "key concession" that caused this Court to remand in *Pritchard*. 159 F.4th at 672. In *Pritchard*, BCBSIL "admit[ted] that the treatments Plaintiffs seek can be medically necessary" yet "BCBSIL categorically excludes those treatments." *Id.* As a result, this Court concluded that BCBSIL "cannot justify its categorical exclusion by citing medical necessity." *Id.* That circumstance is manifestly not present here: Premera does not

61

categorically exclude coverage for mastectomy for minors but engages in case-by-case evaluation of medical necessity—and, after that evaluation, covers forty-four percent of requested procedures. That Premera examines the medical necessity of the requested procedure in *every* case refutes Plaintiffs' evidence-free assertion of invidious discrimination.

### 2. Plaintiffs' alleged evidence of pretext fails to create a genuine fact dispute.

In the district court, Plaintiffs identified five pieces of evidence they contended showed pretext. On appeal, Plaintiffs are limited to these five previously identified evidentiary arguments. "Appellate review is limited to the record presented to the district court at the time of summary judgment." *DeFries v. Union Pac. R.R. Co.*, 104 F.4th 1091, 1105 (9th Cir. 2024). But none of these five comes close to showing that Premera acted with invidious and discriminatory intent.

*First,* Plaintiffs claimed that "six years after" imposing an age limitation in its Medical Policy, Premera "retroactively came up with a medical justification solely to ensure compliance with Section 1557" and "then tried to boost its justification, post-litigation." 5-ER-1067. But

there is no evidence in the summary judgment record to support these assertions. None.

Plaintiffs' aspersions cast on the process of creating the Medical Policy are refuted by the undisputed record. As explained above, when drafting and updating the Medical Policy, Premera considered the medical literature, professional society guidelines, and other insurers' policies. *See supra* pp. 7-11. Premera's Medical Policy has remained consistent for many years, has not been retracted, and is updated at least annually to ensure it reflects the current state of the science and applicable authority, and for clarity. 2-ER-264-66.

But even if Premera's Medical Policy had not been thoughtfully developed and was instead poorly articulated, hastily adopted, or changed *ex post*, those criticisms are entirely irrelevant so long as Premera honestly believed that its medical policy was reasonable and supported by the science. In judging whether Premera's proffered justifications were inaccurate or false, "it is not important whether they were *objectively* false.... Rather, courts only require that [Premera] honestly believed its reason for its actions, even if its reason is foolish or

63

trivial or even baseless." *Villiarimo*, 281 F.3d at 1063 (emphasis in original) (quotation marks omitted).

Plaintiffs' argument "amounts to nothing more than an assertion that [Premera's] assessment was incorrect," which does not prove pretext. *Opara*, 57 F.4th at 727. After deposing Premera's Medical Directors who developed the Medical Policy, Plaintiffs have presented no evidence that Premera did not honestly believe its proffered reasons for the age limitation for gender-affirming surgery. Premera's reasons "cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason[s] [were] false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in the original). There is no summary judgment evidence of either here.

*Second*, Plaintiffs claimed that Premera's age limitation is invidious sex discrimination because it "is not applied to the same or similar surgeries for minors with other conditions." 5-ER-1067. But Premera does not treat similarly situated cisgender minors more favorably: as *Skrmetti* holds, minors with a diagnosis of gender dysphoria are not similarly situated to minors with other diagnoses.

64

Moreover, Premera requires a physical functional impairment for surgery to be covered for both transgender and cisgender minors.

Under Premera's gynecomastia policy, surgery is medically necessary when, among other requirements, the breast tissue is causing a "physical functional impairment," which includes but is not limited to "problems with ambulation, mobilization, communication, respiration, eating, swallowing, vision, facial expression, skin integrity, distortion of nearby body parts or obstruction of an orifice." 4-ER-889; 4-ER-891. The gynecomastia policy is explicit that "social, emotional and psychological impairment[s]" are not covered. 4-ER-891. Premera's Medical Director explained that Premera's gynecomastia policy concerns "a physical functional impairment. So these patients are having, typically, pain or a complication like back pain because their breasts are too large for their body." 2-ER-79. This physical limitation requirement applies equally to all members, whether cisgender or transgender.

Gender dysphoria is a mental health diagnosis, not a physical functional limitation. Mental, emotional, and neurodevelopmental maturity is relevant only to a mental health diagnosis. Age is not relevant to the physical injury or impairment required for coverage of

65

surgery for a gynecomastia or cancer diagnosis. Thus, Premera does not cover the "same or similar surgery" for cisgender minors.

Many specialty societies, including the ASPS, have highlighted the differences between surgery as a treatment for gender dysphoria and surgery as a treatment for other physical functional conditions, including gynecomastia. The ASPS confirmed that "there is an ethical distinction between gender-related surgical interventions for minors (e.g., mastectomy, vaginoplasty) and other plastic surgical procedures occasionally performed on adolescents (e.g., breast reduction, gynecomastia surgery)."[8]

Because minors with other medical conditions involving physical impairments are not similarly situated, Plaintiffs' attempt to show discriminatory animus by comparing dissimilar medical policies falls short of the mark. *See, e.g., Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003) (concluding that plaintiff's proposed comparators were not similarly situated).

---

[8] Am. Soc'y of Plastic Surgeons, *ASPS Position Statement on Gender Surgery for Children and Adolescents* 3 (2026), https://www.plasticsurgery.org/documents/health-policy/positions/2026-gender-surgery-children-adolescents.pdf.

*Third*, Plaintiffs argued that "[w]hen Premera covers chest surgery for gender dysphoria sought by transgender minors," it "approves coverage based on wholly unrelated criteria." 5-ER-1067. To begin, this assertion, even if true, is not probative of animus. Moreover, this assertion is belied by the record. The criteria Premera considers includes whether the member is experiencing a physical functional limitation, including when some "adolescents … bind their breasts for gender affirmation" purposes, causing "potentially significant physical harms." 2-ER-268. If Premera's medical necessity review determines that "the potential physical harm from continuing to bind" for a patient is "greater than the potential harms from having the individual actually undergo a surgery," then Premera covers the surgery. *Id.* The criteria that Premera uses are directly related to the requests for mastectomies.

*Fourth*, Plaintiffs argued that Drs. Moat and Small lacked "experience delivering the care" described in the Medical Policy and failed to "consult[] any gender-affirming care specialists who are currently treating patients or any surgeons who practice in this area." 5-ER-1067.

67

As an initial matter, even if true, that Premera's Medical Directors were unqualified is not probative of pretext. The question for pretext is not whether the Medical Policy they wrote was objectively medically correct, but whether they honestly believed that it was medically correct. *Villiarimo*, 281 F.3d at 1063. And Plaintiffs have no evidence contradicting the testimony that they honestly believed it was medically correct.

Moreover, Plaintiffs' assertion is at odds with the factual record. Premera's Medical Directors are well qualified: Dr. Moat worked as an internal medicine doctor and spent nearly two decades developing medical policies, and Dr. Small is a board-certified Child and Adolescent Psychiatrist who has extensive training in critical appraisal of scientific studies and experience working with adolescents with gender dysphoria. 2-ER-251; 2-ER-333-36. And as discussed above, they employed a reasonable methodology for developing and updating the Medical Policy. *See supra* pp. 7-11.

*Fifth*, Plaintiffs claimed that Dr. Small's "unwritten and hidden criteria require transgender minors to be in extraordinary physical and emotional pain before Premera will cover the treatment," while "non-

transgender minors who seek the same surgery need not experience such extreme pain and emotional distress to receive coverage," thus demonstrating an "inconsistent[] appli[cation] across the same or similar surgical procedures." 5-ER-1068.

As an initial matter, this is factually untrue: Premera requires that members have pain or another physical functional impairment in order to get gynecomastia surgery, including as a minor. 4-ER-889; 4-ER-891.

And again, the minors in question are not "similarly situated" because the minors seek the surgery for *different reasons*. And the different reasons—or different diagnoses—make all the difference, as demonstrated in *Skrmetti* and *Pritchard*. And, in all events, Plaintiffs have no evidence that Premera's reasons for denying certain gender-affirming surgery claims for minors were "unworthy of credence." *Villiarimo*, 281 F.3d at 1063.

In sum, there are no facts to support an inference that discrimination motivated Premera's Medical Policy or that Premera's explanations are not credible.

69

### III. Applying Section 1557 to Premera violates the Spending Clause because Premera was not on notice of potential liability.

Even if the judgment for Plaintiffs could survive *Skrmetti* and *Pritchard*, Premera cannot be held liable under Section 1557 because it had insufficient notice that its prohibition against sex discrimination extended to a policy based on medical diagnosis.

Section 1557 incorporates Title IX. Like Title IX, Section 1557 was enacted pursuant to Congress' authority under the Spending Clause. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 575-77 (2012); *Cummings v. Premier Rehab Keller, P.L.L.C.*, 948 F.3d 673, 676 (5th Cir. 2020) ("§ 1557 of the ACA [is] Spending Clause legislation"), *aff'd*, 596 U.S. 212 (2022). "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022).

Before a recipient may be subject to liability, the court must ask a "simple question: Would a prospective funding recipient, at the time it 'engaged in the process of deciding whether [to] accept' federal dollars, have been aware that it would face such liability?" *Id.* at 220. In other

70

words, the court inquires whether the recipient "voluntarily and knowingly accepts the terms of the 'contract.'" *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 577. To impose liability, Congress must "speak with a clear voice" when imposing conditions on the receipt of federal funds, *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999), and those conditions must be set out "unambiguously," *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

These principles apply fully when federal funds are provided to private entities like Premera. For example, in *Cummings*, the deaf and blind plaintiff sought physical therapy from a private entity, defendant Premier Rehab Keller, and asked it to provide an ASL interpreter at her sessions. 596 U.S. at 216-17. When Premier refused to offer such an interpreter, the plaintiff sued under, among other statutes, Section 1557. *Id.* at 217. Premier was subject to Section 1557 because it received Medicare and Medicaid for some of its services. *Id.* at 217. The Court applied its Spending-Clause precedents to hold that the plaintiff could not seek damages for emotional distress because Premier lacked notice that it exposed itself to such damages by accepting federal funds.

71

*Id.* at 220-22. Because of the lack of notice, the Court explained that it "cannot treat federal funding recipients as having consented to be subject to damages for emotional distress." *Id.* at 222.

Similarly, Premera has not consented to be subject to liability for sex discrimination for adopting an evidence-based policy restricting surgery for children based on the medical diagnosis. The text of Title IX itself only uses the term "sex," and does not unambiguously prohibit discrimination on the basis of "gender identity" or medical diagnosis. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"). And when read together, *Skrmetti* and *Pritchard* now confirm that a policy that turns on a medical diagnosis of gender dysphoria is not sex-based discrimination.

At the very least, Premera could not have had "adequate notice, when [it] accepted federal funding" that benefits determinations based on a gender-dysphoria diagnosis would constitute discrimination on the basis of sex. *Roe v. Critchfield*, 137 F.4th 912, 929 (9th Cir. 2025); *see also B.P.J.*, 2026 WL 1868739, at *18 (Gorsuch, J., concurring). In *Roe*, this

72

Court upheld the denial of a motion for preliminary injunction brought by a transgender student challenging Idaho Senate Bill 1100 ("S.B. 1100"), which required all public-school students in Idaho to use only the restroom and changing facility corresponding to their "biological sex." *Id.* at 919.

The plaintiffs in *Roe* argued that S.B. 1100 violates Title IX because the bill's bathroom requirement discriminated "on the basis of sex." 20 U.S.C. § 1681(a); *see* 137 F.4th at 926-27. This Court did not resolve this question because it found, as a preliminary matter, that S.B. 1100 failed to provide the clear notice required to establish liability under Spending Clause statutes like Title IX. *Id.* at 928-31.

This Court explained that a federal funding recipient must have "clear notice" of "what rules it must follow," *id.* at 929 (quoting *Cummings*, 596 U.S. at 220), and that funding recipients cannot "knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.* Applying this "clear notice" rule, this Court affirmed that the defendant in *Roe* did not have "clear notice at the time it accepted federal funding that Title IX prohibits segregated access to the

73

facilities covered by S.B. 1100 on the basis of transgender status." *Id.* at 931.

Courts faced with this same issue in cases involving state challenges to Section 1557's implementing regulations have repeatedly held that federal funding recipients were not sufficiently put on notice that Title IX's prohibition against sex discrimination would be extended to treatments for medical diagnoses of gender dysphoria.[9]

In *Pritchard*, this Court did not have occasion to resolve the "clear notice" question because it found that BCBSIL forfeited the issue by failing to argue it in the district court or its opening brief.[10] 159 F.4th at 660-61. Here, by comparison, Premera repeatedly argued it lacked clear notice in both summary judgment briefs. *See* 2-ER-134-36; 4-ER-824-25.

---

[9] *See, e.g.*, *Tennessee v. Cardona*, 762 F. Supp. 3d 615, 626 (E.D. Ky. 2025), *appeal dismissed per stipulation*, No. 25-5206 (6th Cir. May 13, 2026); *Oklahoma v. Cardona,* 743 F. Supp. 3d 1314, 1329 (W.D. Okla. 2024); *Arkansas v. U.S. Dep't of Educ.*, 742 F. Supp. 3d 919, 943 (E.D. Mo. 2024); *Kansas v. U.S. Dep't of Educ.*, 739 F. Supp. 3d 902, 926 (D. Kan. 2024), *appeal dismissed per stipulation*, No. 24-3097, 2025 WL 1914861 (10th Cir. Mar. 13, 2025).

[10] *Pritchard* also held that because the defendant received federal financial assistance for *some* operations, it was subject to Section 1557 for *all* operations. 159 F.4th at 656-60. While this holding is binding on this Panel, Premera respectfully reserves the right to challenge it before the *en banc* Court or the Supreme Court.

Premera then promptly filed a notice of supplemental authority advising of this Court's opinion in *Roe v. Critchfield* and continued to raise the issue in its supplemental briefing on *Skrmetti*. 2-ER-46-52; 2-ER-63-70; 2-ER-73-76. There can be no argument that Premera failed to preserve its Spending Clause argument here.

*Roe v. Critchfield* confirms that Premera did not receive clear notice that Title IX's prohibition on sex discrimination would extend to a medical policy that reasonably considered medical diagnosis in the context of a treatment of an individual's gender identity. Because Title IX does not unambiguously inform funding recipients that its prohibition on sex discrimination reaches policies based on a medical diagnosis of gender dysphoria, Plaintiffs' sex discrimination claims against Premera must fail.

## IV. The district court erred in finding the plaintiffs were entitled to prospective declaratory relief.

Even if the summary judgment were proper, this Court should reverse the declaratory judgment.

It is undisputed that both Plaintiffs have undergone mastectomies—the only procedure for which they sought coverage from Premera that was denied. 1-ER-42. The district court thus concluded—

75

correctly—that "A.B.'s and J.M.'s respective mastectomies (as well as J.M.'s reaching of adulthood) have left them with no basis to seek an injunction." 1-ER-39. The court nonetheless held that A.B. and J.M. "are entitled to a declaratory judgment." 1-ER-43. For the same reasons that Plaintiffs cannot obtain injunctive relief, their claims for prospective declaratory relief also fail.

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1057 (9th Cir. 2023). Because "standing is not dispensed in gross, … a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (internal quotation marks omitted).

Thus, "a plaintiff who has standing to seek damages for a past injury … does not necessarily have standing to seek prospective relief such as a declaratory judgment." *Mayfield*, 599 F.3d at 969. "'[A]t the

76

summary judgment stage, a plaintiff must offer evidence and specific facts demonstrating each element' of Article III standing."[11] *Jones*, 74 F.4th at 1058.

A.B. and J.M. lack an injury in fact sufficient for declaratory relief. To seek prospective relief, A.B. and J.M. must allege either "'continuing, present adverse effects' due to [their] exposure to Defendants' past illegal conduct," or "'a sufficient likelihood that [they] will again be wronged in a similar way.'" *Villa v. Maricopa Cnty.*, 865 F.3d 1224, 1229 (9th Cir. 2017). "To the extent a plaintiff seeks relief for a possible future injury, that injury must be 'certainly impending,' or there must be a 'substantial risk' that the harm will occur." *Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 991 (9th Cir. 2023). Accordingly, when plaintiffs "seek declaratory … relief, they must demonstrate that they are 'realistically threatened by a repetition of the violation.'" *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006).

---

[11] Standing "may be raised at any time, even for the first time on appeal." *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 452 n.3 (9th Cir. 2021).

A.B. and J.M. face no possibility of future injury. They already had mastectomies and cannot have them again. 2-ER-218-20; 6-ER-1175. Moreover, both are older than eighteen, and the challenged policy no longer applies to them. 7-ER-1524; 6-ER-1316. A.B. and J.M. are therefore not "realistically threatened by a repetition of the violation" and therefore lack standing to request declaratory relief. *Gest*, 443 F.3d at 1181. For standing purposes, there is no difference between injunctive relief—for which the district court agreed that A.B. and J.M. lacked standing—and declaratory relief. *See Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019) ("Obtaining standing for declaratory relief has the same requirements as obtaining standing for injunctive relief."); *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 923 n.5 (4th Cir. 2022). "[W]hen there is no ongoing violation, '[t]he issuance of a declaratory judgment … is barred.'" *Cardenas v. Anzai*, 311 F.3d 929, 936 n.4 (9th Cir. 2002).

This Court should therefore reverse the declaratory judgment.

## CONCLUSION

This Court should reverse the sex-discrimination judgment and remand for entry of judgment for Premera.

Date: July 6, 2026.

Respectfully submitted,

/s/ Gwendolyn C. Payton

ADAM H. CHARNES                    GWENDOLYN C. PAYTON
KILPATRICK TOWNSEND &              JOHN R. NEELEMAN
  STOCKTON LLP           KILPATRICK TOWNSEND &
2001 Ross Avenue, Suite 4400         STOCKTON LLP
Dallas, TX 75201                   1420 Fifth Ave., Suite 3700
(214) 922-7106                     Seattle, WA 98101
acharnes@ktslaw.com                (206) 626-7714
                                   gpayton@ktslaw.com
                                   jneeleman@ktslaw.com

                                   STEPHANIE BEDARD
                                   KILPATRICK TOWNSEND &
                                     STOCKTON LLP
                                   1100 Peachtree Street NE
                                   Suite 2800
                                   Atlanta, GA 30309
                                   (404) 815-6039
                                   sbedard@ktslaw.com

*Attorneys for Premera Blue Cross*

79

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** | 25-5803, 25-6143

The undersigned attorney or self-represented party states the following:

◉ I am unaware of any related cases currently pending in this court.

◯ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◯ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Gwendolyn C. Payton    **Date** | Jul 6, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-5803, 25-6143

I am the attorney or self-represented party.

**This brief contains** 13,997 **words, including** 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

◉ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Gwendolyn C. Payton   **Date** July 6, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                            *Rev. 12/01/22*

# ADDENDUM

## 42 U.S. Code § 18116. Nondiscrimination

### (a) In general

Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

### (b) Continued application of laws

Nothing in this title (or an amendment made by this title) shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), section 794 of title 29, or the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], or to supersede State laws that provide additional protections against discrimination on any basis described in subsection (a).

### (c) Regulations

The Secretary may promulgate regulations to implement this section.

1

2

**20 U.S. Code § 1681. Sex**

**(a) Prohibition against discrimination; exceptions**

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

2