Nos. 25-5803, 25-6143

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

L.B., *et al.*,

Plaintiffs-Appellees/Cross-Appellants

v.

PREMERA BLUE CROSS,

Defendant-Appellant/Cross-Appellee

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN
SUPPORT OF APPELLANT/CROSS-APPELLEE URGING REVERSAL

*(See inside cover for continuation of cover)*

*(Continuation of cover)*

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant
  Attorney General

R. JONAS GEISSLER
  Deputy Assistant Attorney
  General

ANDREW G. BRANIFF
  Acting Chief, Appellate Section

GREGORY DOLIN, M.D.
  Senior Counsel

KELSEY E. McGEE
  Attorney
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-9251

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ............................................................................... 1

INTEREST OF THE UNITED STATES .................................................. 2

STATEMENT OF THE ISSUE ............................................................. 3

STATEMENT OF THE CASE .............................................................. 3

PROCEDURAL BACKGROUND ........................................................... 6

ARGUMENT

    I.      Premera's policies turn not on "sex" but on diagnosis. ......... 8

        A.     Premera's policy is a medical-use classification, not sex-based classification. ........................................... 9

        B.     Title IX's definition of "sex" is not "synonymous with 'gender identity.'" ................................................ 19

    II.    Premera's policy does not discriminate on the basis of age ................................................................................. 22

    III.   There is no scientific consensus that "gender affirming" surgeries are ever medically necessary. ............. 28

CONCLUSION .............................................................................. 31

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                                 **PAGE**

*Adams by and through Kasper v. School Bd. of St. Johns Cnty.*,
57 F.4th 791 (11th Cir. 2022) (en banc) .........................................20

*Anderson v. Crouch*, 169 F.4th 474 (4th Cir.),
*reh'g en banc denied*, No. 22-1927,
2026 WL 1782288 (4th Cir. May 29, 2026) .......................2, 7, 16-17

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ...............................9-10, 15

*Doe v. Rocky Mountain Classical Acad.*,
99 F.4th 1256 (10th Cir. 2024) .......................................................16

*Emeldi v. University of Or.*, 673 F.3d 1218 (9th Cir.),
*as amended*, 698 F.3d 715 (9th Cir. 2012) .....................................18

*Florida v. Department of Health and Hum. Servs.*,
739 F. Supp. 3d 1091 (M.D. Fla. 2024) ..........................................21

*Geduldig v. Aiello*, 417 U.S. 484 (1974) .................................................11

*Gossett v. Oklahoma ex rel. Board of Regents for Langston Univ.*,
245 F.3d 1172 (10th Cir. 2001) .......................................................18

*Grabowski v. Arizona Bd. of Regents*,
69 F.4th 1110 (9th Cir. 2023) .........................................................17

*Harris v. McRae*, 448 U.S. 297 (1980) ....................................................11

*Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167 (2005) .......................18

*Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc),
*cert. granted*, judgment vacated *sub nom.*
*Crouch v. Anderson*, 145 S. Ct. 2835 (2025) .........................7, 15-17

**CASES (continued):** **PAGE**

*Lange v. Houston Cnty.*,
152 F.4th 1245 (11th Cir. 2025) (en banc) ............................2, 17-18

*L.B. v. Premera Blue Cross*,
781 F. Supp. 3d 1128 (W.D. Wash. 2025) ........................................3

*Pritchard on behalf of C.P. v. Blue Cross Blue Shield of Ill.*,
159 F.4th 646 (9th Cir. 2025) .............................................2, 7, 14-16

*Soule by Stanescu v. Connecticut Ass'n of Schs.*,
57 F.4th 43 (2d Cir. 2022) .............................................................17

*Tennessee v. Becerra*, 739 F. Supp. 3d 467 (S.D. Miss. 2024).................21

*Texas v. Becerra*, 739 F. Supp. 3d 522 (E.D. Tex. 2024) ........................21

*United States v. Skrmetti*, 605 U.S. 495 (2025) .............................. *passim*

*Waleyko v. Phelan*, 146 F.4th 89 (1st Cir. 2025) ....................................17

*West Va. v. B.P.J.*, Nos. 24-43,
2026 WL 1868739 (S. Ct. June 30, 2026)............................10, 18-20

*Wills v. Brown Univ.*, 184 F.3d 20 (1st Cir. 1999) .................................18

**STATUTES:**

Affordable Care Act (Section 1557)
42 U.S.C. 18116(a)...........................................................2, 5-6, 19
Pub. L. No. 111-148, 124 Stat. 119 (2010) ......................................1

Age Discrimination Act of 1975
42 U.S.C. 6101 *et seq.* .......................................................................2
42 U.S.C. 6103(b)(1)(A) ...............................................................22

**STATUTES (continued):**                                          **PAGE**

Education Amendments of 1972 (Title IX)
    20 U.S.C. 1681 *et seq.* ...............................................................................2

**REGULATIONS:**

81 Fed. Reg. 31,375 (May 16, 2016) .......................................................23

85 Fed. Reg. 37,160 (June 19, 2020) ......................................................23

89 Fed. Reg. 37,522 (May 6, 2024) .........................................................23

**RULES:**

Fed. R. App. P. 29(a)(2) ...........................................................................3

9th Cir. R. 29-1 .........................................................................................3

**MISCELLANEOUS:**

Andrew Jacobs, *Doctors' Group Endorses Restrictions on*
    *Gender-Related Surgery for Minors*, N.Y. Times
    (Feb. 4, 2026), https://tinyurl.com/4jx7ayw7 .................................25

E.U. Agency for Fundamental Rights, *Access to Sex Reassignment*
    *Surgery*, https://tinyurl.com/58yd8cbu...........................................25

H. Cass, *Independent Review of Gender Identity Services for*
    *Children and Young People:  Final Report* (Apr. 2024),
    https://www.congress.gov/119/meeting/house/118390/
    documents/HMKP-119-JU00-20250610-SD006.pdf.................23-24

Inst. for Quality and Efficiency in Health Care,
    *Scoliosis in Teenagers:  Learn More – Surgery for Scoliosis*
    (updated Mar. 25, 2024),
    https://www.ncbi.nlm.nih.gov/books/NBK608497/ .......................27

## MISCELLANEOUS (continued):                      PAGE

Joe Brierley, *et al.*, *European Academy of Paediatrics Statement on the Clinical Management of Children and Adolescents with Gender Dysphoria*, 12 Frontier Pediatrics 1298884 (Feb. 5, 2024), https://doi.org/10.3389/fped.2024.1298884 ................................... 25

Joshua E. Lewis, *et al.*, *Examining Gender-Specific Mental Health Risks after Gender-Affirming Surgery: A National Database Study*, 22 J. Sex. Med. 645 (2025), https://doi.org/10.1093/jsxmed/qdaf026 ........................................ 29

Kai Dallas, *et al.*, *Complications After Gender Affirming Vaginoplasty in a Large Population-Based Cohort*, 206 J. Urology e541 (2021), https://doi.org/10.1097/JU.0000000000002032.08 ......................... 29

Pien Rawee, *et al.*, *Development of Gender Non-Contentedness During Adolescence and Early Adulthood*, 53 Archives of Sexual Behavior 1813 (2024), https://doi.org/10.1007/s10508-024-02817-5 ................................. 26

Premera Blue Cross Preferred Bronze EPO 6650, *Benefit Booklet for Individual and Families Residing in Washington*, https://www.premera.com/documents/045606_2025.pdf ............... 13

Premera Pol'y No. 7.01.503, Ruth E. Johnson, *et al.*, *Gynecomastia—evaluation and current treatment options*, 7 Therapeutics and Clinical Risk Mgmt. (2011) https://doi.org/10.2147/TCRM.S10181 ............................................. 5

**MISCELLANEOUS (continued):**                                    **PAGE**

Sameh Shehata, *et al.*, *The Management of Intraabdominal*
      *Testis: A Survey of the World Federation of Associations*
      *of Pediatric Surgeons (WOFAPS) Practices*,
      10 Frontier Pediatrics 928069 (June 28, 2022)
      https://doi.org/10.3389/fped.2022.928069 .....................................27

Stedman's Medical Dictionary (Westlaw 2014) ................................. 5, 14

U.S. Department of Health and Human Services,
      *Treatment for Pediatric Gender Dysphoria: Review*
      *of Evidence and Best Practices*,
      https://tinyurl.com/2yb9w96u ........................................................24

Youssef Aref, *et al.*, *Back Pain in Patients with*
      *Macromastia: What a Spine Surgeon Should Know?*,
      25 Spine J. 403 (2025)
      https://doi.org/10.1016/j.spinee.2024.10.009 ................................. 14

Zainab Yusufali Motiwala, *et al.*, *Postoperative Urogynecologic*
      *Complications After Gender-Affirming Surgery: A Narrative*
      *Review*, Int'l Urogynecology J. (2025),
      https://doi.org/10.1007/s00192-025-06405-6 .................................29

## INTRODUCTION

Defendant-Appellant/Cross-Appellee Premera Blue Cross (Premera) is a health insurance provider active in the State of Washington.  As part of its business, Premera sells health insurance policies on marketplaces created and authorized by the Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (ACA).  Premera's medical and payment policies, which describe whether and when Premera will pay for a particular medical service, govern the policies' coverage.  One of these policies—Premera Blue Cross Medical Policy No. 7.01.557— denies, except in extraordinary circumstances, coverage for "gender affirming" surgeries performed on minors.

Appellees in this case argue that Premera's policy constitutes sex discrimination in violation of Section 1557 of the ACA.  They are wrong. Far from being discrimination on the basis of sex, this sensible policy is rooted in biological reality, developmental psychology, and medical diagnosis. As recently explained by the Supreme Court in *United States v. Skrmetti*, 605 U.S. 495, 514 (2025), regulating medical procedures on the basis of diagnosis does not automatically amount to discrimination on the basis of sex.  The district court's conclusion to the contrary was

- 1 -

erroneous and conflicts with binding authority from the Supreme Court and this Court, as well as the decisions of the Fourth and Eleventh Circuits. *See ibid.*; *Pritchard on behalf of C.P. v. Blue Cross Blue Shield of Ill.*, 159 F.4th 646 (9th Cir. 2025); *Anderson v. Crouch*, 169 F.4th 474 (4th Cir.), *reh'g en banc denied*, No. 22-1927, 2026 WL 1782288 (4th Cir. May 29, 2026); *Lange v. Houston Cnty.*, 152 F.4th 1245 (11th Cir. 2025) (en banc).

This Court should reverse.

## INTEREST OF THE UNITED STATES

The United States has a substantial interest in the proper interpretation of federal anti-discrimination law, whether constitutional or statutory. The United States' interest is heightened in this appeal, including the proper application of Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 *et seq.*, and the Age Discrimination Act of 1975, 42 U.S.C. 6101 *et seq.*, as the grounds prohibited under these laws and the laws' enforcement mechanisms, are addressed in the text of Section 1557 of the ACA, 42 U.S.C. 18116(a). Moreover, with similar litigation percolating in other courts, *see, e.g.*, *Anderson v. Crouch*, 169 F.4th 474 (4th Cir.), *reh'g en banc denied*, No. 22-1927, 2026 WL 1782288

- 2 -

Case: 25-6143, 07/13/2026, DktEntry: 24.1, Page 11 of 39

(4th Cir. May 29, 2026), and the fact that rule-makings interpreting Section 1557 has been mired in litigation for close to a decade, *see L.B. v. Premera Blue Cross*, 781 F. Supp. 3d 1128, 1136 n.3 (W.D. Wash. 2025) (tracing the history of Department of Health and Human Services rulemaking with respect to Section 1557), United States has a heightened interest in a judicial resolution of the application of this provision.

The United States files this brief under Federal Rule of Appellate Procedure 29(a)(2).  *See also* 9th Cir. R. 29-1.

## STATEMENT OF THE ISSUE

Whether Premera's policy, which limits insurance coverage for "gender affirming" surgeries sought by minors, while providing coverage for similar surgeries by minors with diagnosis other than gender dysphoria, discriminates on the basis of sex and/or age.

## STATEMENT OF THE CASE

Premera is a health insurance company.  It both sells health insurance directly and acts as an administrator of a health plan run by the Association of Washington Business.  Under both situations, whether a particular medical treatment or intervention is covered by insurance

- 3 -

depends in part on whether such intervention "meets the standards set forth in Premera's medical and payment policies." 1-ER-16; 1-ER-18.[1] Premera Policy No. 7.01.557, denies coverage for "gender affirming" surgeries sought by minors.[2] Under this policy, "mastectomy or breast reduction" for "female to male patients" or "female to nonbinary/gender neutral patients" when such patients are under 18 years of age is not covered. 2-ER-275 (citation modified). Premera, however, performs a case-by-case review whenever coverage is sought for some surgeries and makes exceptions when, for example "(i) the minor is breast or chest 'binding,' causing rib or skeletal injury, respiratory compromise, significant skin wounds, or pain, (ii) the minor is experiencing suicidal ideation, self-harm behaviors, or severe functional impairment as a result of 'breast-induced gender dysphoria,' and/or (iii) the minor has

---

[1] "__-ER-__" refers to the volume and page numbers in the Excerpts of Record filed with appellant's opening brief.

[2] Under the same policy, coverage is available for adult patients when certain medical criteria are met. The full policy is reproduced at 2-ER-271-326.

severe gynecomastia[3] that renders 'binding' or hiding of the breasts infeasible." 1-ER-20 (citation omitted); *see also* 4-ER-879-880.

Plaintiffs-Appellees/Cross-Appellants[4] A.B. and J.M, acting through their parents, challenged Premera's exclusion of "gender confirmation" surgeries for minors from coverage, arguing that this limitation violates Section 1557 of the ACA which states, in relevant part, that

> an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 [("Title IX")] . . . [or] the Age Discrimination Act of 1975 . . . , be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance.

---

[3] Gynecomastia is defined as "[e]xcessive development of the male mammary glands." Stedman's Medical Dictionary 388390 (Westlaw 2014). "Gynecomastia is a benign condition and usually self-limited." Ruth E. Johnson, *et al.*, *Gynecomastia—evaluation and current treatment options*, 7 Therapeutics and Clinical Risk Mgmt. 145, 147 (2011), https://doi.org/10.2147/TCRM.S10181. Absent underlying pathology, only "periodic follow-up are recommended." *Ibid.* It is only when "gynecomastia persists and is associated with pain and/or psychological distress." *Id.* at 148. Premera only provides coverage for surgical intervention when the condition is accompanied by "[p]ain and discomfort due to the distention and tightness from the hypertrophied breast(s) has not responded to medical management." 4-ER-889.

[4] For readability purposes, hereinafter the brief will refer to Premera as Appellant and A.B. and J.M. as Appellees.

42 U.S.C. 18116(a).[5] *See* 5-ER-1097-1121.

Appellees alleged that because Premera covers breast reductions for male minors suffering from gynecomastia, but not for female minors wishing to surgically "transition" to a male-looking body, Premera's insurance plan discriminates on the basis of sex. 5-ER-1115-1117. Appellees further contend that the policy, being appliable only to minors, also discriminates on the basis of age. 5-ER-1117-1119.

## PROCEDURAL BACKGROUND

This matter was resolved on Cross-motions for Summary Judgment. On April 18, 2025, the district court entered its initial Order granting partial summary judgment in favor of appellees on their sex discrimination claim. It also granted Premera's cross-motion for

---

[5] By its terms, Section 1557 applies only to that "health program or activity . . . which is receiving Federal financial assistance." 42 U.S.C. 18116(a). The parties disagree on whether Section 1557 applies to A.B.'s plan, because the plan under which A.B. is covered does not itself receive federal funds. *See* 1-ER-33-34. Nevertheless, the district court concluded that because some parts of Premera's overall business (such as its ACA-marketplace plans or Medicare Advantage plans) receive Federal financial assistance, the ACA's non-discrimination provisions apply to all of Premera's offerings. *See* 1-ER-34. This is also reflected in the district court's final Judgment which required Premera to reimburse *A.B.* for the out-of-pocket expenses associated with the mastectomy, even though A.B. was not insured through an ACA-marketplace plan. *See* 1-ER-3.

summary judgment with respect to appellees' age-discrimination claim, dismissing the same for failure to exhaust administrative remedies. Additionally, the court denied appellees' Motion for Class Certification. 1-ER-43-44.

In reaching its conclusion on the sex-discrimination claim, the district court heavily relied on the since-vacated Fourth Circuit's decision in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc), *cert. granted*, judgment vacated *sub nom. Crouch v. Anderson*, 145 S. Ct. 2835 (2025).[6] *See* 1-ER-27; 1-ER-29-32.

Following *Skrmetti* (and supplemental briefing on the import of that case to the issues before it), the district court declined to recede from

---

[6] In its later Order, the district court denied that its analysis turned on *Kadel*, and attempted to distinguish it because *Kadel* included both an ACA claim and a Fourteenth Amendment Equal Protection Claim, the latter of which is absent in the present case. According to the district court, in the absence of a "constitutional tort claim [in the present case], the vacatur of the *Kadel* Court's decision has no impact on th[e] Court's earlier ruling." 1-ER-11. As explained in more detail below, and in light of *Kadel*'s subsequent history, *see Anderson v. Crouch*, 169 F.4th 474 (4th Cir.), *reh'g en banc denied*, No. 22-1927, 2026 WL 1782288 (4th Cir. May 29, 2026), the district court's attempt to limit *Skrmetti* to "constitutional tort claim[s]" was erroneous and contrary to this Court's decision in *Pritchard on behalf of C.P. v. Blue Cross Blue Shield of Illinois*, 159 F.4th 646 (9th Cir. 2025).

- 7 -

its prior holding, concluding that the Supreme Court's decision not only does not undermine it, but actually supports it. 1-ER-4-12. Accordingly, the district court entered a stipulated final Judgment. 1-ER-2-3. The Judgment directed Premera to pay appellees' out-of-pocket expenses that were incurred obtaining mastectomies outside of insurance coverage. 1-ER-2-3.

Both parties timely cross-appealed from the adverse portions of the Judgment. 5-ER-1122-1126.

## ARGUMENT

### I.    Premera's policies turn not on "sex" but on diagnosis.

The district court analyzed sex discrimination from two perspectives. First, it considered whether Premera's policies discriminate on the basis of sex if sex is defined as "'biological sex' or 'sex assigned at birth.'" 1-ER-29. Then, the district court addressed the same question assuming "that 'sex' is synonymous with 'gender identity.'" 1-ER-31. The court concluded that under either definition, Premera's policy violate Section 1557 because it discriminates on the basis of "sex." 1-ER-43. Both conclusions are erroneous.

The district court's opinion essentially reduces to the following propositions. *First,* the district court reasoned that it is irrelevant whether mastectomies are "medical[ly] necess[ary]" in the context of a minor's "gender transition" if the policy in question is facially discriminatory. *See* 1-ER-24-26 (citation omitted). In other words, according to the district court, if the policy, on its face treats men and women differently, courts need not inquire whether such a differential treatment can be explained by medical considerations. *Second*, the district court, reasoned that boys suffering from gynecomastia and seeking surgical intervention to correct the same are similarly situated to girls who wish to "transition" to the male gender. Neither proposition is legally sound.

## A. Premera's policy is a medical-use classification, not sex-based classification.

In *Bostock v. Clayton County*, the Supreme Court held that to make out a claim for discrimination on the basis of sex under Title VII, a plaintiff needs to show that "but for" his or her sex, the outcome would have been different. 590 U.S. 644, 656 (2020). "[A] but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Ibid.* But the *Bostock* Court recognized

that "transgender status [is a] distinct concept[] from sex." *Id.* at 669.[7]
*See also West Va. v. B.P.J.*, No. 24-43, 2026 WL 1868739, at *7 (S. Ct. June 30, 2026) ("The term 'sex' in the 1972 Title IX statute . . . cannot plausibly be interpreted to refer to anything other than biological sex."). Under *Skrmetti,* different legal treatment of different medical diagnoses—including gender dysphoria—is permissible and does not violate the Equal Protection Clause, even if a diagnosis is associated with a patient's sex. *See United States v. Skrmetti*, 605 U.S. 495, 519 (2025). *Skrmetti* is clear: prohibitions on certain medical procedures for trans-identifying minors do not amount to discrimination "on the basis of sex." *Id.* at 512-514. If an outright ban on certain procedures does not constitute sex discrimination, *a fortiori*, neither the Constitution nor Title IX can be held to require funding of these selfsame procedures. *Cf.*

---

[7] True enough, "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex," *Bostock*, 590 U.S. at 669, but only where the person alleging discrimination would have been treated differently "but for" his sex, *see id.* at 656. In other words, discrimination against a man for wearing women's clothing is discrimination on the basis of sex because a woman wearing the same clothes would have been treated differently. *See id.* at 659-660 ("[I]f changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred.").

*Harris v. McRae*, 448 U.S. 297, 315-318 (1980) (holding that even where the Constitution guarantees a right to a particular medical procedure, failure to fund the procedure does not constitute a violation of that constitutional right).

The mere fact that a procedure is one "that only one sex can undergo," does not change the analysis. *Skrmetti*, 605 U.S. at 518 (citing *Geduldig v. Aiello*, 417 U.S. 484 (1974)). It is true that only biological girls normally develop breasts, and therefore only biological girls would seek a mastectomy when attempting to "transition." But it does not follow that denying coverage for such mastectomies discriminates on the basis of sex. It would be one thing if Premera's policies denied coverage for any breast surgeries, no matter the cause, to girls, while providing coverage to boys suffering from gynecomastia or breast cancer or any other condition necessitating surgery in the breast region. But Premera's policy does not do that. Rather, it denies coverage for a *specific intervention* stemming from a *specific condition*. Moreover, Premera's policies equally refuse coverage to both boys and girls who seek *any* surgical interventions in pursuit of an attempt to "transition" to a different gender. *See* 2-ER-275-279 (applying the age restriction to

- 11 -

procedures ranging from penectomies to laser hair removal).  Indeed, on the *very same page* of the *very same policy* that the district court found to be sex-discriminatory, Premera states that it will cover neither "mastectomy or breast reduction for female to male patients female to nonbinary/gender neutral patients" nor "augmentation mammoplasty/breast augmentation (implants and/or lipofilling) for: male to female patients" who are under 18 years of age.  2-ER-275 (citation modified).  Thus, Premera will not cover breast reductions or augmentation for trans-identifying girls and boys, respectively, and it will also not cover vaginoplasties, penectomies, orchiectomies, or any of the other surgical procedures for minors of any sex who seek to "transition."  2-ER-276.[8]

The mere fact that surgeries necessary to "transition" in one direction are different than surgeries necessary to "transition" in another direction, does not make the denial of coverage for any of these surgeries "sex-based discrimination."

---

[8]  Premera *will* cover all of these procedures (assuming other criteria are met) for adults who seek to "transition."  2-ER-271-326.

The *Skrmetti* Court addressed this very situation. It explained that it is permissible for States to prohibit prescription of puberty blockers for boys seeking to "transition" even though the same puberty blockers are available for girls experiencing abnormal facial hair growth and boys undergoing precocious puberty. *Skrmetti*, 605 U.S. at 521-522. The reason is obvious—in such a scenario, *both* girls *and* boys can access a particular drug so long as it is for purposes other than "transitioning." *Id.* at 522. In other words, changing the *sex* of the individual does not change the equation, while changing the *diagnosis* does. *Ibid.* Premera's policies operate in exactly the same manner. Mastectomies are available to both boys and girls in some circumstances, but not others. For example, a girl diagnosed with breast cancer will have her mastectomy paid for, if such mastectomy is medically appropriate.[9] Similarly, Premera will pay for a mastectomy where it is needed because of

---

[9] *See* Premera Blue Cross Preferred Bronze EPO 6650, *Benefit Booklet for Individual and Families Residing in Washington* at 45, https://www.premera.com/documents/045606_2025.pdf.

The fact that breast cancer in adolescents is extraordinarily rare and thus mastectomies are seldom if ever performed, is not a relevant consideration. The point is that coverage for the procedure is not denied "on the basis of sex," but rather on the basis of diagnosis.

macromastia.[10]  The district court's conclusion that Premera's coverage policies treat boys and girls differently on the basis of sex is plainly erroneous.

Every Court of Appeals—including this Court—to have considered this issue post-*Skrmetti* has rejected the district court's reasoning.  For example, in *Pritchard on behalf of C.P. v. Blue Cross Blue Shield of Illinois*, 159 F.4th 646 (9th Cir. 2025), this Court considered whether Blue Cross's policy that "refuse[d] to cover treatment for gender dysphoria" violated Section 1557's prohibitions on sex discrimination.  *Id.* at 653.  In that case, the district court held for the plaintiffs, finding that Blue Cross's policy discriminated on the basis of sex.  *Id.* at 656.  The Ninth Circuit reversed, holding that "[t]he district court's reasoning fails in light of *Skrmetti*."  *Id.* at 669.  The Court explained that "[t]hough [insurer]'s exclusions reference sex, and though that reference may be

---

[10]    *See* Premera Pol'y No. 7.01.503, https://www.premera.com/medicalpolicies/7.01.503.pdf.

Macromastia is defined as "abnormally large breasts."  Stedman's Medical Dictionary 521780 (Westlaw 2014).  This condition may necessitate surgical intervention to alleviate symptoms like neck and back pain.  *See* Youssef Aref, *et al.*, *Back Pain in Patients with Macromastia:  What a Spine Surgeon Should Know?*, 25 Spine J. 403 (2025), https://doi.org/10.1016/j.spinee.2024.10.009.

relevant, it is not sufficient to trigger *Bostock*'s application." *Id.* at 670. Moreover, the Court explicitly rejected plaintiff's attempt to limit *Skrmetti* (like the district court did here, *see* 1-ER-7; 1-ER-11) "to the constitutional context." *Pritchard*, 159 F.4th at 669. As this Court wrote, "[t]hough Skrmetti was a constitutional case, its logic reaches more broadly," including to Section 1557. *Ibid.* *Pritchard* is thus directly on point and is sufficient to resolve this case. And because the district court's reasoning is directly at odds with *Pritchard*, the judgment below must be reversed.

*Pritchard* also fully aligns with the recent decisions of the Eleventh and Fourth Circuits. The decision of the Fourth Circuit is particularly noteworthy because it is the opinion of that court which formed the backbone of the district court's conclusion in this case. In 2024, the *en banc* Fourth Circuit held that Medicaid's or state-operated employee insurance plan's denial of coverage for gender transition surgeries violated the Equal Protection Clause. *See Kadel v. Folwell*, 100 F.4th 122, 143 (4th Cir. 2024) (en banc), *cert. granted*, judgment vacated *sub*

*nom. Crouch v. Anderson*, 145 S. Ct. 2835 (2025).[11]  The district court repeatedly cited that opinion in the present case.  *See* 1-ER-27; 1-ER-29-32.  Following its decision in *Skrmetti*, the Supreme Court vacated *Kadel* and remanded the matter for further proceedings.[12]  On remand, the Fourth Circuit explicitly held that an insurer does not violate Section 1557 when it denies coverage for certain procedures in the absence of a "qualifying diagnosis."  *Anderson v. Crouch*, 169 F.4th 474, 493 (4th Cir.) (citation omitted), *reh'g en banc denied*, No. 22-1927, 2026 WL 1782288 (4th Cir. May 29, 2026).  The fact that a patient could get the same treatment with a *different* diagnosis only strengthened the conclusion that the insurer was acting on a basis *other than sex*.  *Ibid.*  The Fourth

---

[11]  The Fourth Circuit's decision rested on that Court's analysis of the Equal Protection Clause.  While the Court also held that the policies in question likewise violated the ACA, the Court did not engage in any detailed analysis of the issue, *see Kadel*, 100 F.4th at 163-164, perhaps because a violation of the Equal Protection Clause necessarily entails a violation of Title IX.  *See, e.g.*, *Doe v. Rocky Mountain Classical Acad.*, 99 F.4th 1256, 1261 (10th Cir. 2024) ("[F]or the same reasons we reverse the district court's dismissal of plaintiff's claim of sex discrimination in violation of the Fourteenth Amendment's Equal Protection Clause, we reverse the district court's dismissal of plaintiff's Title IX sex discrimination claim.").

[12]  This Court recognized that "when the Supreme Court handed down *Skrmetti*, it held *Kadel* was no longer good law."  *Pritchard*, 159 F.4th at 670.

- 16 -

Circuit itself has thus repudiated its own analysis in *Kadel* on which the court below relied.[13]

Finally, the en banc Eleventh Circuit rejected the proposition that denial of health insurance coverage for "gender affirming care" violates Title VII. *See Lange v. Houston Cnty.*, 152 F.4th 1245 (11th Cir. 2025) (en banc). While that court did not address Section 1557, "[t]he Supreme Court has often looked to its Title VII interpretations of discrimination in illuminating Title IX['s prohibition on sex discrimination]" which Section 1557 incorporates, and courts "construe Title IX's protections consistently with those of Title VII when considering a Title IX discrimination claim." *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023) (citations and internal quotations marks omitted). *See also Waleyko v. Phelan*, 146 F.4th 89, 99 n.5 (1st Cir. 2025) ("[T]he relevant standards governing sex-based discrimination claims under Title VII and Title IX are the same."); *Soule by Stanescu v. Connecticut Ass'n of Schs.*, 57 F.4th 43, 55 (2d Cir. 2022) ("Title IX

---

[13] No Fourth Circuit judge requested a vote on plaintiff's petition to rehear the case en banc. *See Anderson v. Crouch*, No. 22-1927, 2026 WL 1782288 (4th Cir. May 29, 2026) (denying petition for rehearing en banc).

includes language identical to that in Title VII."); *Emeldi v. University of Or.*, 673 F.3d 1218, 1224 (9th Cir.), as amended, 698 F.3d 715 (9th Cir. 2012) ("[T]he Supreme Court has often looked to its Title VII interpretations of discrimination in illuminating Title IX.") (citation and internal quotation marks omitted); *Gossett v. Oklahoma ex rel. Board of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims.").[14]  The Eleventh Circuit concluded that "[t]he Supreme Court's reasoning in *Skrmetti* applies equally [to the case challenging insurance coverage denials].  The . . . policy does not pay for a sex change operation *for anyone regardless of their biological sex*." *Lange*, 152 F.4th at 1252 (emphasis added).  The same is true of the Premera's policy.  If anything, Premera's policies are more generous— they do not exclude "transition" related surgeries generally, but only with respect to minor children, and even there, depending on particular

---

[14] To be sure, Title VII and Title IX are "vastly different" statutes. *See B.P.J.*, 2026 WL 1868739, at *9 (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005)).  Nevertheless, and despite these differences, "in some respects . . . the two statutes are construed in pari materia." *Wills v. Brown Univ.*, 184 F.3d 20, 25 n.3 (1st Cir. 1999).

symptomatology and medical diagnosis, provide for exceptions on a case-by-case basis.[15]

In summary, the district court's analysis is inconsistent with the Supreme Court's precedent in *Skrmetti* and the considered judgment of every appellate court to subsequently consider the matter. Simply put, excluding certain specific treatment in response to specific diagnosis for individuals under 18 years of age does not constitute sex discrimination.

## B. Title IX's definition of "sex" is not "synonymous with 'gender identity.'"

The district court also concluded that Premera's policies discriminate on the basis of sex if "sex" were defined as "synonymous with 'gender identity.'" 1-ER-31. This approach is squarely foreclosed by the Supreme Court's recent decision in *West Virginia v. B.P.J.*,[16] analyzing

---

[15] As discussed below, neither the availability of coverage to adult patients, nor the exceptions with respect to minors are necessary for Premera to prevail, because relevant expertise has found that surgical transition procedures are never "medically necessary." But if policies that deny coverage altogether do not violate Title VII or Title IX, then *a fortiori*, Premera's more limited restrictions also do not violate those provisions.

[16] Section 1557 statutorily incorporates the ground of prohibited conduct under Title IX, and thus, cannot prohibit conduct that Title IX does not reach. *See* 42 U.S.C. 18116(a).

- 19 -

sex-separated sports participation under Title IX, which explicitly held that "[t]he term 'sex' in the 1972 Title IX statute . . . cannot plausibly be interpreted to refer to anything other than biological sex" because "[t]he ordinary meaning of the term 'sex' at the time of enactment in the early 1970s was biological sex and not gender identity."  No. 24-43, 2026 WL 1868739, at *7 (S. Ct. June 30, 2026).  The Supreme Court's holding in *B.P.J.* endorsed the consensus that has been developing in the lower courts.

For example, the Eleventh Circuit explained why "sex" cannot possibly mean "gender identity" within the context of Title IX, writing

> [R]eading "sex" to include "gender identity" . . . would result in situations where an entity would be prohibited from installing or enforcing the otherwise permissible sex-based carve-outs when the carve-outs come into conflict with a transgender person's gender identity.  Such a reading would thereby establish dual protection under Title IX based on *both* sex and gender identity when gender identity does not match sex.  That conclusion cannot comport with the plain meaning of "sex" at the time of Title IX's enactment and the purpose of Title IX and its implementing regulations, as derived from their text.

*Adams by and through Kasper v. School Bd. of St. Johns Cnty.*, 57 F.4th 791, 814 (11th Cir. 2022) (en banc).

- 20 -

This reasoning was adopted by a number of district courts as well. *See, e.g.*, *Tennessee v. Becerra*, 739 F. Supp. 3d 467 (S.D. Miss. 2024); *Florida v. Department of Health and Hum. Servs.*, 739 F. Supp. 3d 1091 (M.D. Fla. 2024); *Texas v. Becerra*, 739 F. Supp. 3d 522 (E.D. Tex. 2024). The district court's definition cannot be squared with the plain text of Title IX, incorporated in Section 1557.

In any event, even if Section 1557's definition of "sex" included "gender identity" (it does not),[17] the district court's conclusion that Premera discriminates on the basis of gender identity would still be wrong. As explained in the preceding part, Premera's policies focus on *diagnosis* and *age*, not natal sex or one's gender identity. Premera covers a full suite of medical and surgical interventions for individuals diagnosed with gender dysphoria, but it limits coverage for some irreversible interventions to individuals with appropriate physical, emotional, and psychological development.

---

[17] *See* Final Judgment at 1-2, *Tennessee v. Kennedy*, No. 1:24-cv-161-LG-BWR (S.D. Miss. Oct. 22, 2025) (docket entry 80) (declaring that HHS exceeded its statutory authority by interpreting "Title IX, as incorporated into Section 1557, to prohibit discrimination on the basis of gender identity").

## II. Premera's policy does not discriminate on the basis of age.

Premera's limitations on insurance coverage apply only to individuals under 18 years of age. Premera covers mastectomies (and other surgeries) for adults wishing to "transition" to another gender. For that reason, appellees alleged that this policy violates the Age Discrimination Act of 1975 which is incorporated into Section 1557. Though the district court dismissed this claim on procedural grounds, the United States will address this argument on the merits.[18]

As an initial matter, the Age Discrimination Act exempts from its condemnation actions that "reasonably take[] into account age as a factor necessary to the normal operation or the achievement of any statutory objective of [a] program or activity." 42 U.S.C. 6103(b)(1)(A). Many medical procedures consider age for the obvious reason that some procedures are inappropriate for individuals who are too old or too young. Because healthcare insurance policies generally cover only medically necessary and appropriate procedures, such policies routinely do not

---

[18] The United States does not take a position on the correctness of the district court's holding that appellees' age discrimination claim is barred for failure to exhaust administrative remedies.

cover certain procedures for those who are too old or too young to undergo such procedures. Limiting coverage in this manner does not violate the Age Discrimination Act where age is "a factor necessary to the normal operation" of medicine and of health insurance coverage. Indeed, all three iterations of the U.S. Department of Health and Human Services' regulations, implementing Section 1557 (2016, 2020, and 2024 versions) acknowledge the permissibility of certain age-related distinctions. *See* 89 Fed. Reg. 37,522, 37,604-37,605 (May 6, 2024); 85 Fed. Reg. 37,160, 37,177 (June 19, 2020); 81 Fed. Reg. 31,375, 31,408 (May 18, 2016).

Premera's policy does not discriminate on the basis of age for one simple reason— it considers "gender affirming" surgeries (whatever their value is for adult patients) medically inappropriate for minors under most circumstances. This comports with the relevant medical evidence. "[A] report commissioned by England's National Health Service (NHS England) characterized the evidence concerning the use of puberty blockers and hormones to treat transgender minors as 'remarkably weak,' concluding that there is 'no good evidence on the long-term outcomes of interventions to manage gender-related distress.'" *United States v. Skrmetti*, 605 U.S. 495, 524 (2025) (quoting H. Cass,

- 23 -

*Independent Review of Gender Identity Services for Children and Young People: Final Report*, at 13 (Apr. 2024), https://www.congress.gov/119/meeting/house/118390/documents/HMKP-119-JU00-20250610-SD006.pdf). A November 2025 report by the Office of the Assistant Secretary for Health at HHS examining, among other things, the evidence for "gender affirming care" for minors, reached the same conclusions as the Cass Review. *See* U.S. Department of Health and Human Services, *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, at 13 (Nov. 19, 2025), https://tinyurl.com/2yb9w96u ("The . . . review found that the overall quality of evidence concerning the effects of any intervention on psychological outcomes, quality of life, regret, or long-term health, is very low. This indicates that the beneficial effects reported in the literature are likely to differ substantially from the true effects of the interventions."). Multiple European countries and more than half the American states have restricted or outright banned "gender affirming" surgeries for minors. Currently, Austria, Czechia, Croatia, Denmark, Finland, Italy, Latvia, Lithuania, the Netherlands, Poland, Portugal, Spain, and Sweden do not permit any "gender affirming" surgeries for

- 24 -

individuals under 18 years of age. *See* E.U. Agency for Fundamental Rights, *Access to Sex Reassignment Surgery*, https://tinyurl.com/58yd8cbu.

Both American and European medical societies have expressed skepticism about medical appropriateness of "gender affirming" surgeries for minors. *See, e.g.*, Andrew Jacobs, *Doctors' Group Endorses Restrictions on Gender-Related Surgery for Minors*, N.Y. Times (Feb. 4, 2026), https://tinyurl.com/4jx7ayw7 (noting that both the American Society of Plastic Surgeons and the American Medical Association have rejected the propriety of "gender affirming" surgeries for minors because evidence supporting such interventions was "low quality" and "insufficient"); Joe Brierley, *et al.*, *European Academy of Paediatrics Statement on the Clinical Management of Children and Adolescents with Gender Dysphoria*, 12 Frontier Pediatrics 1298884, at 4 (Feb. 5, 2024), https://doi.org/10.3389/fped.2024.1298884 ("Given . . . the child's right to an open future, our view as paediatricians is that it is correct to defer irreversible surgery until adulthood.").

Recent international studies have also shown that the majority of children who experience gender confusion or gender distress in early

childhood eventually outgrow these feelings. For example, a 2024 Dutch study showed that "[i]n early adolescence, 11% of participants reported gender non-contentedness," but that number decreased by almost two thirds, *i.e.*, to "4% at the last follow-up (around age 26)." Pien Rawee, *et al.*, *Development of Gender Non-Contentedness During Adolescence and Early Adulthood*, 53 Archives of Sexual Behavior 1813, 1813 (2024), https://doi.org/10.1007/s10508-024-02817-5. In concluding that "gender affirming" surgeries for minors are clinically inappropriate and are not medically necessary, one does not discriminate on the basis of age, but simply takes into account the high likelihood that gender dysphoria will resolve itself with passage of time.[19] This is no different than, for example, the approach to treating scoliosis where, except in extreme cases, surgical intervention is not recommended until the patient is at an

---

[19] This is not to concede that such surgeries are medically necessary for adults. *See*, Part III, *infra*. But even assuming, *arguendo*, that "gender affirming" surgeries are necessary for adults with persistent gender dysphoria, it still makes eminent sense to reject irreversible medical interventions in minors whose gender dysphoria may resolve by adulthood.

end of the adolescent growth spurt.[20] Similarly, surgeons do not recommend immediate surgery for undescended testicles in newborns, because there is a strong possibility that the problem will resolve on its own. Instead, the recommendation is to wait between 6 and 18 months before proceeding with surgery. *See, e.g.*, Sameh Shehata, *et al.*, *The Management of Intraabdominal Testis: A Survey of the World Federation of Associations of Pediatric Surgeons (WOFAPS) Practices*, 10 Frontier Pediatrics 928069, at 3 (June 28, 2022), https://doi.org/10.3389/fped.2022.928069. Given the significant hormone-mediated physical and emotional changes that occur during adolescence, and the fact that this hormonal flux subsides as the child completes the pubertal transition to adulthood, it makes eminent medical (and ethical) sense to postpone any irreversible surgical interventions aimed at meeting such child's perception of self. Postponing such interventions (assuming, *arguendo*, that they are ever medically

---

[20] *See, e.g.*, Inst. for Quality and Efficiency in Health Care, *Scoliosis in Teenagers: Learn More – Surgery for Scoliosis* (updated Mar. 25, 2024), https://www.ncbi.nlm.nih.gov/books/NBK608497/ ("Generally speaking, doctors recommend operating once the teenage growth spurts have ended but before the spine stops growing overall.").

appropriate) is not discrimination on the basis of age, but rather a recognition that even with respect to the same condition, some treatments are medically appropriate at early times, and other, different treatments are appropriate at a later time.

## III. There is no scientific consensus that "gender affirming" surgeries are ever medically necessary.

Private insurance companies can choose to cover whatever treatments they wish, but such surgeries are never medically necessary for either adults or adolescents. Here, Premera has elected to provide coverage for "gender affirming" surgeries for adults, and in some rare cases for minors. Premera also provides coverage for hormonal treatment for the purposes of "transitioning" for both adults and adolescents. The United States, however, does not rest its argument on these voluntary choices by a private party, but rather, on the correct understanding of the requirements of law in light of science.

A number of studies undermine the assertion that "gender affirming" surgeries, irrespective of the age of the patient, are either safe or effective in treating gender dysphoria. For example, a 2021 study in the Journal of Urology reported that more than a quarter of patients who have undergone vaginoplasty had complications with half of this group

- 28 -

requiring additional surgical intervention.[21]  A 2025 study showed that individuals with surgery showed a higher prevalence of depression and anxiety as compared to those without surgery.[22]  There is simply no reliable evidence that "gender affirming" surgery leads to alleviation of symptoms associated with gender dysphoria at a higher rate than other, non-surgical interventions.  *See, e.g.*, Joshua E. Lewis, *et al.*, *Examining Gender-Specific Mental Health Risks after Gender-Affirming Surgery: A National Database Study*, 22 J. Sex. Med. 645 (2025), https://doi.org/10.1093/jsxmed/qdaf026 (finding that "those undergoing surgery were at significantly higher risk for depression, anxiety, suicidal ideation, and substance use disorders than those without surgery").

---

[21]  *See* Kai Dallas, *et al.*, *Complications After Gender Affirming Vaginoplasty in a Large Population-Based Cohort*, 206 J. Urology e541 (2021), https://doi.org/10.1097/JU.0000000000002032.08; *see also* Zainab Yusufali Motiwala, *et al.*, *Postoperative Urogynecologic Complications After Gender-Affirming Surgery: A Narrative Review*, Int'l Urogynecology J. (2025), https://doi.org/10.1007/s00192-025-06405-6 (finding that "[u]rogynecology complications after ["gender affirming" surgery] are prevalent and significantly impact quality of life, contributing to dysphoria and distress").

[22]  Joshua E. Lewis, *et al.*, *Examining Gender-Specific Mental Health Risks after Gender-Affirming Surgery: A National Database Study*, 22 J. Sex. Med. 645 (2025), https://doi.org/10.1093/jsxmed/qdaf026.

To be sure, a competent adult may choose to undergo cosmetic surgery simply because he wishes to do so. Thus, competent adults routinely undergo rhinoplasty, breast enlargements, lobuloplasty, and a myriad of other cosmetic procedures. But these procedures are often not medically necessary,[23] and therefore are not covered by insurance.

---

[23] There may, of course, be instances where such procedures are necessary. For example, breast implants may be part of reconstructive surgery post tumor-related mastectomy. Rhinoplasty may be medically indicated to address problems with breathing, sinus infections, or the like.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's decision.

Respectfully submitted,

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant
  Attorney General

R. JONAS GEISSLER
  Deputy Assistant Attorney
  General

ANDREW G. BRANIFF
   Acting Chief Appellate Section

s/ Gregory Dolin
GREGORY DOLIN, M.D.
  Senior Counsel
  KELSEY E. MCGEE
  Attorney
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-9251